Bradley, J.
—The defendant, with a pistol, shot and killed William E. Roy, at Castile, in the county of Wyoming. The contention of his counsel is that conviction of the crime of murder in the first degree was not justified, because the evidence did not fairly permit the conclusion that the act was committed with deliberate and premeditated design to effect the death of the person killed, although he may have intended to kill Roy. The deceased and his half-sister, Eva Roy, were sitting in the front room of their father’s house, and the defendant came from his sleeping room, on the second floor down stairs, into the room where they were, and when within a few feet of the deceased fired the fatal shot.
It may be assumed that the jury were warranted in finding that he did this with the premeditated design to kill Roy, which was sufficient to constitute the crime of murder. But since the design to effect death must be deliberate as well as premeditated to permit conviction of murder in the first degree (Penal Code, § 183), such additional requirement must be established by the evidence to permit such result, and without it the conviction cannot be for a greater offense than murder in the second degree. Id., § 184. The question therefore arises whether the evidence was such as to justify the conclusion that the defendant was guilty of the higher grade of the crime of murder.
The.defendant, at the time in question, was a young man twenty-two years of age. He came to Castile in the spring of 1886, stayed there a while, became acquainted with Eva Roy, then aged sixteen years. He went away, was absent some time, and returned there in August, engaged work at his trade as tailor, and the latter part of the month went to her father’s house to board, and boarded there up to the time of the unfortunate occurrence referred to. Within two weeks after he went there, the defendant proposed marriage to Eva, to which he says she then acceded, and her evidence is that although she did not then, she afterward did accept his proposal and that they became engaged. She lived at home, and William E. Roy, her half-brother, aged twenty years, engaged at work elsewhere, was in the habit of coming to the house and visiting with Eva. The defendant became dissatisfied with his presence because it denied to him her attention, and the object for social intercourse with her which he desired, and because he suspected that their relations were something more, especially on the part of William, than those arising merely from the affection Of brother and sister. This was the subject of remark by him in the manner hereafter mentioned. On the evening of October 6, 1886, the defendant had returned from his work to the house about nine o’clock, and shortly after.. *61 Eva and William came into the dining-room, where her mother and the defendant were sitting. They all remained there for a little time, when the mother and William went into the front or sitting-room, leaving the defendant and Eva in the dining-room alone.
The mother a while after called to Eva to come into the sitting-room, and she not immediately doing so, the mother afterwards went into the dining-room and said to her and to the defendant, that it was time to go to bed. The defendant went up stairs to his room, Eva went into the sittmg-room, William was also there, and they sat down in that room The father was lying on a lounge (which was the place where he slept) in the same room, and the mother went into an adjoining bed-room to get her small child to sleep
It seemed to have been understood there that evening that William was going away on a midnight train. Between twelve and one o’clock in the morning the defendant was heard by Eva coming down the stairs, and she testified that she saw him peering through the doorway on the stairs; that he then went part way back up the stairs and returned to the same place, and after stopping there and looking as before, he returned to his room, and immediately came out and down the stairs, and after looking again from the stairway, he came on into the room where she and William were; that he approached near to where she was sitting and said.to her: “Eva, I thought your mother told you to go to bed;” that she answered, “She did when I was sitting up with you, but she found Will was going away, and she said that I could sit up with him until train time;” that he then walked in a circular line around the place where William sat and to a place opposite, between which and the place occupied by William stood a sewing machine and a small stand; there he stopped and said: “Tour mother was very anxious to have me go to bed so that you and Will could sit up and spark, wasn’t she ?” to which no reply was made; that she then said to her brother that he would be late unless he went soon, and asked him to tell her where he was going, and he said to her, “Lean over and I will whisper it to you,” which she proceeded to do, and that instant the defendant fired, shooting William in the head.
It is contended by the defendant’s counsel that this act was without any reflection and wholly the result of impulse suddenly produced by anger caused by the suggestion so made by William and the acceding to it by her for private communication in the manner described, and in view of the existing relation of affiance of the defendant to her. And the defendant testified that until she leaned towards *62 the deceased and their heads came near together, the pistol remained in his pocket and he had no thought of injuring him; that up to that time he had no thought of shooting, and remembered nothing of his thoughts at the time he drew his revolver and fired. If the jury had adopted as true his statement, they should not have convicted the defendant of the crime of murder in the first degree. And if they had entertained any reasonable doubt of the fact of his deliberate as well as premeditated design to kill the deceased, their duty would not have permitted the conviction of that offense,' because to justify such result every reasonable hypothesis consistent with innocence in respect to any essential element of the crime must be excluded by the evidence in the view legitimately taken of it by the jury
The circumstances already related were such as to permit an interpretation of the act of shooting somewhat different from that furnished by the defendant’s evidence before mentioned. He had been in the habit of carrying the pistol evenings, and when he went to his room to retire at night he usually took it from his pocket and laid it on a desk in the room. He says that this night it remained in his hip pocket, that he undressed, went to bed, and slept an hour, he thinks, before he got up.
Why did he get up and go down stairs ? He says that when he awoke he heard some persons talking low or whispering in the room below, and he had the curiosity to learn who they were, so he got up, went to a stove-pipe hole in the floor of his room, but could there neither hear what they said or learn who they were, although he had some suspicion that the persons were Eva and her brother William. He doés not agree entirely with Eva’s statement as to the number of times he proceeded to go down stairs and returned before he entered the room where they were, but says he returned the first time he started to go down because he made a noise by knocking down a piece of plank on the stairs, and the next time he started to go he proceeded down into the room and on his way looked through the stairway door and saw who the persons were. He says that his purpose in going down was if William was there with Eva to tell him he had no business there that time in the morning, and that he thought he had a perfect right to drive him out. The fact that the defendant sought observation of these persons in the manner he did, went into the room, walked about there, stopped at the place from which he fired his pistol, taking into account the intermediate time occupied, and in view of some other evidence, enabled the jury to conclude that his purpose was not harmless and that the act of shooting was not entirely without delibera *63 tian in the sense which that term may be applied. He was jealous of William, and Eva says that the defendant had before said to her “that this half-brother business was played out; it was something like third cousins, and he wanted me to stop it. He said he was. dangerously jealous and I had better look out for him.” And there is evidence to the effect that after the shooting he said he was jealous of William, and had repeatedly warned him that unless he kept away he would suffer the consequences,, and that if he had paid attention tc half the good advice that had been given him, he would not be in the situation he was; that before he got out of bed he heard talking in the front room below; mistrusted it was young Boy talking with Eva; took his revolver in his hand, went down stairs, asked Eva why she did not go to bed, and at that she leaned over and said something to Will, and being my affianced I thought I ought to know what she said; she gave me no answer; and that he stepped back six feet., drew his revolver and fired; “I shot to kill, and I am a pretty good shot;” that he repeatedly said jealousy caused the act.
There is evidence tending to show the expression by him of a purpose to use his pistol at other times and of threats to that effect. That on the occasion of hi; proposal of marriage to Eva and her refusal, he seid they must either live together or die together, and that he exhibited his pistol and made some threatening remarks, and that on a subsequent occasion they had some difficulty and he threatened to shoot, or talked of shooting her; that on another occasion he raised his revolver and pointed it at a young man, who he thought was intruding upon a private interview between him and Eva, and apparently apprehending danger the young man suddenly departed, and that at another time in the house when they were together, an inquiry in another room by her father for Eva was heard by them, and the mother went into the room where they were, and as she approached the door the defendant exhibited some excitement, and when her mother had left, Eva asked him what was the matter, and he remarked that if the person coming in had been her father, and he had said anything about their being together he would have shot him. The importance of the evidence of these remarks, threats, and conduct of the defendant was for the consideration of the jury.
Whether they were meaningless or indicated a recklessness of character which rendered him dangerous to those who sought to interrupt or defeat the execution of his purposes was for the jury. The defendant evidently was excitable and impulsive. He had at times been afflicted with epileptic fits, and there is evidence tending to prove that he *64 occasionally had delusions; that when in an excited condition he was apparently not capable of controlling his conduct and actions; that at the time in question he was overcome by suspicion and jealousy and that while he intended to do what he did, he did not at the time consider the consequences of the act. Also, that he understood or believed that Eva’s people, including William, were opposing and ■endeavoring to defeat his marriage with her, and that as a consequence of this and his jealousy he had for considerable time been restless and unable to sleep much nights, and his power of self-control had become so weakened that his condition was in some sense that of desperation for the time being, and the power to resist the sudden impulse of anger, may in some degree have been denied him. But on the part of the prosecution it is contended that the evidence warranted the conclusion that the defendant took his pistol from his sleeping room purposely, when he went down stairs, because William was there with Eva. There are some circumstances in support of such inference. If the jury disregarded the evidence of the defendant in that respect, they might, upon the evidence, have found that the defendant provided himself with his revolver at the time he left his room to come down the stairs.
By the fact that his habit was to take the pistol from his pocket when he went to his room to retire, and upon the evidence of Eva, that after he looked through the stairway door, he went back to his room and immediately came out and down the stairs, and proceeded into the room where she and William were sitting, and in view of the other evidence relative to his suspicious feelings towards William and his jealousy, his remarks and threats previously made, and his subsequent statements permitted the inference that when he saw those persons sitting there together his jealous indignation was such, that his return to his room was to provide himself with the weapon, and that he took it and immediately proceeded down stairs. While time intervening between the impelling cause, real or imaginary, and . the act, is an element for consideration upon the question whether killing is the result of deliberation, the requisite time for such purpose can be measured by no rule, other than that furnished by the circumstances of each case.
The term “premediated design” substantially takes the place of that of “malice aforethought,” or “malice prepense” used in indictments at common law, and the time requisite to constitute it may not be distinguishable from that of the act of killing, although it must be said to precede the act. People v. Clark, 7 N. Y., 385; Fitzgerrold v. People, 37 N. Y., 413. The addition of the term deliberate requires some appreciable time for reflection preceding the *65 act of killing, but the celerity of mental action is such that the formation of a definite purpose may not occupy more than a moment of time. People v. Majone, 91 N. Y., 211; Leighton v. People, 10 Abb. N. C., 261; aff’d, 88 N. Y., 117.
The time occupied, after the intent in drawing the revolver from his pocket, may have been sufficient time for the requisite deliberation. People v. Conroy, 97 N. Y., 62; S. C., 33 Hun, 119. And to constitute this condition it was not necessary that the anger of the defendant should have subsided or that his excitement produced by the occasion should have been abated. Sindram v. People, 88 N. Y., 196. In the case last cited it was held that the fact that the prisoner was subject to fits of passion from slight causes, or that prior to the act his conduct was eccentric and peculiar, was immaterial unless it tended to show insanity, and had relevancy for that purpose only. It is not and could not well be claimed in this case that insanity was established. The operation of the mind of the defendant and the formation of a purpose in respect to his act in shooting the deceased could not be shown by direct evidence, but whether the act was preceded by and attended with deliberation, is to be found in the circumstances proved, and if sufficient to permit the affirmative conclusion the question was one of fact for the jury. There is evidence to the effect that from the time the defendant first came to the stair door and saw Eva and her brother sitting in the room, and the time he came into the room, fifteen or twenty minutes intervened, and some little time was also occupied by him in reaching the position from which he fired the fatal shot. And between that place and that where the deceased sat was a sewing machine and a small stand, and the distance between the two places was five feet. Eva says that when the defendant fired, the pistol was very near William’s head. Why and for what purpose the defendant obtained that particular place, with the obstacles between -him and William, was a circumstance for inquiry before the jury, and may have been entitled to some consideration if they concluded that the defendant came into the room with a hostile intent, and as bearing also upon that question, because it may have enabled him to draw his revolver and fire with less liability to frustration if observed in his act of drawing the pistol from his pocket. There is evidence not expressly referred to, bearing somewhat in both directions. But after a careful examination of all the evidence we think it was sufficient to justify the conclusion that all the elements requisite to the crime of murder in the first degree were established and that the verdict of the jury is supported by it.
*66 The case was, by the charge of the court, fairly submitted to the jury with proper instructions and as favorably for the defense as could reasonably be required. No occasion appears on this review to interfere with the result of the-trial..
The judgment and conviction should be affirmed.
Smith, P. J., and Barker, J., concur.