# HENRY BOOKMAN v. STATE.

No. A-2506.   Opinion Filed October 9, 1915.

'(151 Pac. 1074.)

1. **HOMICIDE—Murder—Information—Sufficiency.** An information for murder which after alleging venue and time charges that the defendant did then and there commit the crime of murder, and which charges that the defendant did unlawfully, willfully and feloniously, and with a premeditated design, to effect the death of one "H," did make an assault upon the said "H" with a shot gun, then and there had and held in the hands of the said defendant, and did then and there with said fire arm so had and held as aforesaid, unlawfully, willfully and without authority of law and with a premeditated design to effect the death of the said "H,". fire, shoot, and discharge said shot gun, at, into and upon the said "H," and with said shot gun beat, bruise and wound the said "H," then and there inflicting certain mortal wounds in and upon the said "H," of which mortal wounds the said "H" did then and there instantly die, sufficiently charges the crime of murder, and a demurrer thereto was properly overruled.

2. **HOMICIDE—Appeal in Capital Case—Scope of Review—Presentation Below.** In capital cases, where the sentence is death, this court will examine the entire record, including the evidence, and if satisfied that the verdict is contrary to law or the evidence, or prejudicial error appears, a new trial will be granted, whether any exception shall have been taken or not in the court below.

3. **HOMICIDE—Murder—Sufficiency of Evidence.** Evidence on a trial for murder held sufficient to sustain a capital conviction, and that no material error was committed upon the trial.

*Appeal from District Court, McIntosh County;*
*R. W. Higgins, Judge.*

Henry Bookman was convicted of murder and appeals. Affirmed.

The plaintiff in error in this case was convicted of murder in the District Court of McIntosh county, and his punishment fixed at death, upon an information filed in said court April 21, 1915, charging him with the murder of one Rich Hardin, and in pursuance of the verdict of the jury he was sentenced to

suffer the punishment of death by electrocution as provided by law. The judgment was rendered on the 29th day of May, 1915. From the judgment and sentence he has taken this appeal.

The evidence shows that Rich Hardin, the deceased, a white man, was a farmer living about eight miles northwest of Eufaula, and about a mile from the town of Nero. Plaintiff in error, a negro, had been working for George Booth, also a negro, whose place was about a mile distant from that of the deceased, and that the homicide was committed at the home of George Booth, about two o'clock, p. m., on the second day of April, 1915.

A substantial statement of the evidence is as follows:

Dr. F. L. Smith was the first witness for the state. He testified that he lived at Fame; that he reached the place of the homicide within an hour after its occurrence; that he found the body of Rich Hardin laying in the front yard of Booth's house; that he was then dead; that he examined the body and found several wounds. A part of the right hand was shot off and one charge of shot entered below the arm pit; that there was a scar on his chest; that there were five or six wounds on the head and a big ugly wound on the top and side of the head, and "the entire back part of the head was broken all to pieces, the skull bone crushed, perfectly soft," and some blood and brains were oozing out of the nostrils. That he found a pocket knife in one of the pockets and a piece of tobacco and some kind of a purse or pocket book. The knife was closed and was perfectly clean; that a justice of the peace and several other persons were present at the time.

Lizzie Booth testified that she was the wife of George Booth, that between two and three o'clock in the afternoon of the day of the killing her husband and Henry Bookman who was working for them, were out in the field at work, and the deceased Rich Hardin called at her house.

She further testified as follows:

"Q. What did he do when he first came? A. He came to the door, in the yard and said hello Booth, and I looked out, I was sitting in front of the window sewing, I looked out and saw it was Mr. Hardin and I says Booth is not at home, he is in the

upper field, you passed him, didn't you see him and he says no, I didn't see anyone but Henry. He says I just want to see him about getting a buggy wheel; he had bought a buggy from us in the fall, I broke my buggy wheel down, I got to do some driving and I thought maybe I could get one and I says you look at them, they were out by the side of the fence, you look at them and if you find one you want you can get it, he is going to sell them and he went and looked at three wheels and I says there is one on the south side and he looked at that and he come back and was standing at the porch, and he says I am awful tired, I have been working on the road, and I says won't you come in and sit down, and he come in and sit down by the side of the door and he hadn't been sitting there over five minutes until Henry came and stood in the door. Mr. Hardin turned his head around and says hello Henry. Henry didn't speak. He looked at me and says Mrs. I am awful sick, I have got the cramps, I couldn't hardly get here; Mr. Booth told me to come down and get you to get me some medicine, says get me some soda quick. I got up and started into my dining room, my dining room table sat in front of the door, and I picked up a glass and started around the table to go to the kitchen and get the soda when I heard the report of a gun, two right quick. There was a double barrel shot gun over the door where he was standing when I left the room. I immediately stepped back to the door and when I got to the door they were both up. When I left, Mr. Hardin was sitting down and Henry was standing in the door, and when I got back they were both standing up and he was striking him with the gun over the head. I screamed what is the matter, what is the trouble Henry, I seen Mr. Hardin wasn't doing anything, just had his hands up in front of his face like.

"Q. Indicate to the jury in what position? A. Just like he was, looked like he was this way, looked like he was helpless, had his hands up, wasn't striking and wasn't doing anything and he was striking with the gun.

"Q. Who was striking? A. Henry was striking.

"Q. What was Henry striking with? A. With the gun, and I says what is the matter, what is the trouble. Neither one spoke and then I says stop Henry, stop, do you realize what you are doing, stop, what is the matter, and when I seen he wouldn't pay any attention to me and neither one spoke to me, I ran out the door and began to scream for help, I was screaming loud all

the time and the first one I saw was Mrs. Gardenhire, she lives directly in front of my door in the west field right in front of my door.

"Q. About how far? A. Well, I guess we have almost a quarter of an acre right in front of the house and then the section line and then that field is just directly in front.

"Q. Is it on a hill or in the valley? A. Yes, sir, there is a valley between but she is on the hill, the house sits on the hill.

"Q. Go ahead? A. And when she come then I screamed to her to come as quick as she could and bring her man, I thought I had saw her man that day, but I suppose they were just coming to dinner, there was no man in that field and she come and when she came I told her to go as quick as she could to the next neighbors on the north, Mr. Plemmons, I says run up there and tell them to send to Fame for the officers as quick as they can that Henry had shot Mr. Hardin, and she went right on up there.

"Q. In the meantime what became of Mr. Hardin? A. Well, when I left then, when I couldn't get any attention from either of them I ran out thinking maybe I could make someone come in, and when I ran out in the yard I kept looking back every step, maybe two, I never did see them when they come out of the house, but they come out of the house and Mr. Hardin ran at least ten or fifteen steps from the house before he fell and I looked back once and saw Henry strike him in the back of the head with the gun.

"Q. Do you know what position he was in when he fell? A. Seemed to me like he was laying on his arm, I don't know, I never went up and looked, I wouldn't go up close to him, but seemed like he fell on his face, I think.

"Q. Then Henry ran right up and hit him over the head with the gun? A. With the gun in the back of the head, I saw that.

"Q. What did Henry do, or what did he say? A. Then I come from the gate and I says Henry what on earth do you mean by killing Mr. Hardin, what on earth do you mean, and he says we had a fuss, and I says when did you have a fuss and he says we have had two or three, and I says it looks to me you could settle that without all this bloodshed and he says it is done and I am going away, and I says don't go away and leave me with this dead man, go to the field as quick as you can and tell my husband what you have done and tell him to come home, he was working away from home that day, had a piece of

ground rented away from our farm almost a mile towards Fame, and he was up there and I says go up there and tell him what you have done and tell him to come as quick as you can come. I says don't leave, he kept talking about going and I kept persuading him not to go and leave me, told him to get my husband, I was sick at the time.

"Q. What county and state did this happen in? A. McIntosh county, Oklahoma.

"Q. Now, whose gun was it that Henry used? A. My husband's.

"Q. Would you know the gun if you would see it? I believe I would.

"Q. I will ask you to examine this gun and state if you know what gun it is? A. Yes, sir, I think this is the gun.

"Q. Is this the gun that Henry used at that time? A. I think it is.

"Q. What became of the gun at that time? A. I think part of it laid in the room, it broke in the room, they fought through two rooms, went through two rooms and I think part of it was in one room and when the men began to come through the house and pick up things, I just left everything just as it was because there was blood over nearly everything in the room, and I just left things as they were because I knew they wanted to examine them and I think some of them picked up part of the gun."

George Booth testified that on the afternoon of the day of the killing he was out in the field a half mile from home plowing and Henry Bookman the defendant was there harrowing. The defendant called him and said that he had cramps so bad he could hardly walk and he told him to go to the house for something to cure the cramps and to hurry back and the defendant went to the house; that about a half hour later he heard someone hollow and the defendant ran up to him; that he was all bloody and he said to him what have you done down at the house. The defendant answered: "I have killed Mr. Hardin," that he asked him what for, and he said, "Well, we had a fuss a day or two ago and we had one this morning," and he said he was going away and he said to him, "No you will have to go back to the house, you are not going away," that he took him back down there and when he met Mr. Plemmons he asked him

to go back with him and help him keep this fellow until the law came. That they found Mr. Hardin dead in the front yard and he found his double barreled shot gun lying on the porch and it was broken in two. That he kept his shot gun in a rack over the front door.

J. W. Workman testified that he lived between a quarter and a half mile north of Booth's place and was in the field plowing this afternoon. That Rich Hardin came by and stopped to talk with him and the defendant was just across the road inside of the field at that time. That after talking a few minutes Mr. Hardin went on towards Booth's house, and shortly after that the defendant left the field and a little later he saw the defendant coming back through the field and heard him hollo and that George Booth and the defendant took the team from the harrow and both returned to the house; that later he went over to Booth's house.

Grover Plemmons testified that he lived about a half of the quarter north of Booth's place; that he saw the defendant that afternoon about half past one going towards Booth's house and he was running; that he saw him going back to the field where he had been at work and then saw him return to the house with Booth.

Mary Gardenhire testified that she lived about a quarter of a mile west of Booth's house and heard the shooting and heard a man hollo; that she could see over to Booth's place from where she stood; that she saw a man staggering in the yard; that Mrs. Booth called to her and she went over there; that she saw the defendant striking a man that was laying down and the man he was striking was a white man.

J M. Plemmons testified that he lived about a quarter of a mile north of Booth's place; that he saw the defendant at different times that afternoon. First when he passed his place going to the field to work, then about two or three o'clock, going back to Booth's; that he saw him go up to the house and go in at the west door, and he saw Booth and the defendant returning to the house, and he followed them and found Mr. Hardin dead

in the yard; that Booth asked the defendant, "Henry, what did you do this for," and he answered, "I done it because we had a fuss three or four days ago and when I asked old lady Booth for medicine, Hardin said 'why ain't you at work, that is the way of a damn negro,' and Hardin hit him at the same time, and that was what he killed him for."

L. R. Jordan testified that he was a justice of the peace; that he lived two and a half miles from there, and in answer to a telephone call he rode there on horse back; that he was present when Dr. Smith examined the body and he told Mr. Plemmons to arrest the defendant.

The plaintiff in error, Henry Bookman, as a witness in his own behalf testified that he killed Rich Hardin. His further testimony is as follows:

"Q. Well, now you state in your own way what caused you to do that? A. Well, I leaves the field and goes to the house, I was sick, I had the cramps, and I told Mr. Booth that I was sick, and had been sick for several days, I didn't say anything to him about it at the time, I told him I was sick, I am cramping, I am just cramping so bad I don't know what to do and he says then I will harrow and you go get you some medicine, tell my wife to give you something, some soda, or something for your cramps: I said then it is so far up there I hate to go up there, and he says well, if you are sick you go on to the house and get you some medicine, says I don't want no man to work for me and he being sick and so we drove on out to the end of the row and then I come on out the gate and come down the section and come on to the house, walking, and I went in with my hand hold of my stomach that way and told Mrs., I says Mrs. I am sick as I can be, I wish you would please mam go get some soda or something to ease my stomach, and she says yes I will and she got up then to go to get it, and there was two chairs, one chair sitting there and one further over and I went to the fartherest chair and I sat in the chair with my knee, this knee, up in the chair that way with my arm up this way and my head here and one hand on my stomach this way, and this feller he says to me, he says how come you to come to the house. I says I am as sick as I can be, I am sick as I can be. He says what is the matter and I says I have got the cramps so bad I don't know what to do. He says Oh well hell, you know what is the matter. I told him, no sir, I says I don't, and he says well

your time has come to die and I didn't say anything, I just kept sitting that way, and he said did you hear what I said, and I didn't say anything to him at all, I just sit there. He says do you know I come across the field the other day where you were plowing and I stopped to talk to you and he says you wouldn't· talk, you told me that whenever you were working for a man you didn't have time to stop and talk with another man. I says you are correct, I did say it, I says I hired to him to work and do my work and I believe in doing that, I didn't believe in stopping in the road and talking to everybody and anybody and at that time I didn't have time to talk, and he says I come across the field the other day from hunting and I had been hunting and come across there where you were working and you wouldn't stop that day and talk to me, you wouldn't say nothing to me and says that I told you that I was tired and had been hunting all day and you was the biggest rabbit I seen and I told you I believe I will shoot you to see how fast you will run, and I says no, don't do that, I says if you shoots me just shoot me and don't kill me I am liable to run pretty fast, liable to run pretty fast, no telling how fast I can run, but I never have run, I never give nobody no trouble, and I just turned my horse and drove on and he sit there until I come back and he says I have got a good notion to shoot you, shoot at you to see how fast you can run, says I believe you can run pretty fast and then I stopped then and I asked him was he drunk and he says no he wasn't drunk.

"Mr. Vaughn: Q. When was this conversation had that you are talking about now? Was that had up at the house, or some other time? A. No, sir, that was about a week before then.

"Mr. Vaughan: Object to it, if your honor please.

"The Court: Objection overruled.

"A. He said to me, he says well, I will just shoot you, that is what I will do. I told him no sir, don't do that and I just turns then and drove on with my back to him, drove on off. I went two rounds and he was off on the side of my furrows, where I was plowing setting down. Mind you I went these rounds with him sitting on my furrows where I had plowed and left these furrows and he was sitting there. Sit there until I went two or three rounds, and then he got up when I got up to even with him and just ranged his gun around like that, and I told him, I says, don't do that, I never have done nothing to nobody, to you, I don't see why you want to do me this way, I says I am just working here and trying to get along with everybody, I treated everybody right. Well, he says I have got a good notion to do

it, just that way and then he went to leave and went on and walked off a piece and says mind out you old guy, I will get you for this, I don't like you not talking to me, I says well, sir, I just haven't got the time and I turned right on and kept working, right on, and so I went in the house that evening after I was sick, I went into the house, as I said, I went in and was up in the chair with this hand this way and my head down and he says what you come up here for. I says I am as sick as I can be. I am just sick. What is the matter? I says I have got the cramps and he says you know what is the matter, I says no sir, I don't. He says well your time has come to die, he says I just feel like doing something anyhow, says I just feel like doing something anyhow, he says to me, and I didn't make any answer, didn't say anything to him back at all, just sit there in the chair with my arms up and this knee on the chair and the other foot on the floor and so when he said that he said did you hear me talking to you, and I didn't say anything to him that time and when he asked me then he slapped me, slapped me side of the head and slapped my hat off and kicked me the same time, says damn you, I will just kick you until your nose bleeds, says I will just kick you all over this house, and I got up and reached down to get my hat and he says don't get that hat and run his hand in his pocket and says don't get that hat. I says it is mine, I says will you please let me out of here. I am sick, I will just go back up in the field and tell the man of the house and he says no, I won't let you go nowhere and you won't tell it either, you won't tell the man of the house nothing of what I done to you, says I will just fix you right now and run his hand in his pocket and got his knife out and ran to me and cut at me and cut through my jumper I had on and vest and my overalls to my undershirt and so I shoved him back and got this chair and held the chair between us, I says if you will please just let me out of here I says I will just go, I will go if you will just let me out, I am done hurt, am sick as I am and you imposing on me this way, I will go on back to the field like I am sick and let the medicine go, can't you please let me out and he says no, I won't let you out and I sit the chair down to break to run off and he seed that I was going to run out and when I started he just grabbed the door and slammed the door shut and shut me up in the house and reached up and got this gun and says I will fix you right now, I will just fix you right now. He shut up the knife and reached and got the gun and says I will just fix you right now and made at me with the gun and when I seen he meant what he

said, I run into him, sit the chair down and run into him and takes the gun away from him. When he struck at me, he struck at me first with the gun and struck the gun somewhere against the wall of the house and broke the gun, and when I got the gun it was broke. When I taken it away from him it was broke and I says now let me out of here, I says you have got me hurting all over, I says will you please let me out of here, just let me out of here, and he says no, I am going to kill you I said and just kept coming upon me and run his hand in his pocket again and his other hand in his breast like that and says I am going to kill you I said. He said you have got the gun now you had better kill me, I says I won't do that, I don't want to do that, I says let me out of here if you please, let me out of here, let me out and he says no sir, I won't let you out and come presisting on me and then I fired the shots.

"Q. What did you do after you realized that Mr. Hardin was dead? A. I didn't do anything, I went up in the field and told Mr. Booth.

"Q. You came back to the house with him? A. Yes, sir, I come back to the house with him.

"Q. And it was while you were in fear of being greatly wounded by that knife that you speak of that you hit him with the gun? A. Yes, sir.

"Q. And after you had fired the two shots, then did Mr. Hardin advance towards you again? A. He never did quit, just kept on, run into me, kept on beating me with his fists.

"Q. How, how long was it from the time that Mrs. Booth left that room to get the medicine was it until you fired the shots? A. Well, I would judge that it was about twenty-five minutes I guess, or longer, seemed to me it was about a half an hour, I was sitting down and he kept on talking with me, and kept on telling me what he was going to do with me and she was back in the room in there, kitchen some place getting the stuff.

"Q. Now, you heard the testimony of Mrs. Booth wherein she stated that she had only left the room where you were long enough to cross the next room and return immediately back, is that so? A. No, sir, she had been in there a long while, long time.

"Q. You heard the testimony of Mr. Booth relative to your statement to him after the homicide when you went up to the field, in which you made this statement: I have raised hell down at the house. Did you say that? A. I did not.

"Q. What did you tell him? A. I says I went up to the house, I says that man up there when I got there, I went in and he jumped on me and went to cussing me out and beating me around, said what he was going to do, and he says I know better, what have you done, and I told him I didn't know, you go up to the house and see, I didn't know whether I had killed him or not, to go to the house and see."

In rebuttal Daily Hardin testified that he was fourteen years old and the son of Rich Hardin, the deceased; that his father had not owned a shot gun during the last two years and was not in the habit of going hunting.

JOHN R. McBETH,
For Plaintiff in Error.

R. McMILLAN,
Asst. Atty. Gen., for the State.

DOYLE, P. J. The plaintiff in error, Henry Bookman, was informed against for the murder of one Rich Hardin. The trial jury found him guilty of said charge and fixed his punishment at death. His motion for a new trial having been overruled and sentence of death having been pronounced upon him, the judgment has been brought to this court for review. The errors assigned are as follows:

First. That there was error in overruling the defendant's demurrer to the information.

Second. That there was error in overruling the application for a change of venue.

Third. That there was error in overruling the defendant's motion for a continuance.

Fourth. That there was error in overruling the defendant's demurrer to the evidence.

We are satisfied from an examination of the entire record that the assignments of error are destitute of merit.

The information charges that the defendant unlawfully, wilfully and feloniously and without authority of law and with a premeditated design to effect the death of Rich Hardin, did on the day named make an assault with a shot gun and then and

there unlawfully, feloniously and with a premeditated design to effect the death of said Rich Hardin, did fire, shoot and discharge said shot gun at, into and upon the said Rich Hardin, and with said weapon beat, bruise and wound the said Rich Hardin, then and there inflicting certain mortal wounds in and upon the said Rich Hardin, of which said mortal wounds the said Rich Hardin then and there instantly died.

Where an informati n charges that the injuries to the deceased were inflicted by the defendant with the premeditated design to effect death, and alleges the means with which the homicide was committed, it is sufficient. The demurrer was properly overruled.

The application for a change of venue does not conform to the requirements of the statute. It consists only of the affidavits of the defendant himself and his attorney. Our procedure criminal provides that:

"Any criminal cause pending in the District Court may, at any time before the trial has begun, on the application of the defendant, be removed from the county in which it is pending to some other county in said judicial district, whenever it shall appear in the manner hereinafter provided, that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had therein. Such order of removal may be made on the application of the defendant by petition, setting forth the facts, verified by affidavit, if reasonable notice of the application be given to the county attorney and the truth of the allegation in such petition be supported by the affidavits of at least three credible persons, who reside in said county." Section 5811 Rev. Laws.

It will be noticed that the language of this statute is:

"Whenever it shall appear in the manner hereinafter provided:" The application for the change of venue in this case wholly fails to meet the statutory requirements. It was therefore properly overruled.

The application for a continuance was based on the absence of certain witnesses. Defendant set forth in his affidavit that his father I. L. Bookman, and his two brothers, John and

Terry Bookman, .and his maternal uncle, Willis Williams and two white men, namely: E. Keezler and Bud Sanders if present would testify as character witnesses. That I. L. Bookman resides somewhere in the state of Oklahoma, not known to the defendant; that the other witnesses reside in Grimes county, Texas, and had promised him they would be present in September, 1915, if the case be continued to that time.

It is not claimed that any of the persons named could testify to any of the facts in the case, nor does he aver in his affidavit that he cannot prove the same facts by other witnesses. There was no error in overruling the motion for a continuance.

There can be no doubt as to the sufficiency of the evidence. That the defendant killed the deceased, he did not deny. His defense was that he killed the deceased in his necessary self-defense. It is enough to say that whatever there was of that defense, no one can reasonably claim that it was not properly submitted to the jury, and the jury by their verdict have found that that defense was untenable. We cannot see how, under the evidence in the case, the jury could have reached any other conclusion. We are satisfied from an examination of the record and upon a consideration of the proceedings upon the trial with respect to its fairness, that the defendant had a fair and impartial trial and has been convicted upon evidence that should satisfy the fairest mind of his guilt. There appears to be nothing in the case that would justify this court in interfering with the execution of the judgment and sentence. The judgment appealed from is therefore affirmed.

It is further ordered by this court that the warden of the penitentiary proceed to carry into execution the judgment of the District Court of McIntosh county in this case and the 10th day of December, A. D. 1915, is designated as the date for executing the sentence pronounced.

FURMAN and ARMSTRONG, JJ., concur.