(No. 14631.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LOGAN ESTES, Plaintiff in Error.

*Opinion filed June 21, 1922—Rehearing denied October 6, 1922.*

1. CRIMINAL LAW—*when irregularity in filling panel of jurors does not amount to prejudicial error.* The statute in regard to the drawing and serving of jurors must be substantially complied with, but an irregularity in filling a panel of twenty-four jurors by selecting seven jurors from a list of one hundred names appearing in a special venire already drawn instead of issuing another venire to fill the panel will not cause a reversal, where the defendant makes no claim that he was prejudiced by the court's action in that regard.

2. SAME—*failure to draw jurors twenty days before term is not error.* The statutory requirement that petit jurors shall be drawn twenty days before the first day of any trial term is directory, merely, and the failure to draw them within that time is not error.

3. SAME—*when making up a panel from jurors in attendance more than two weeks is not prejudicial error.* The fact that the jurors constituting the panel for the defendant's case were in attendance at the term as jurors more than two weeks before the defendant's trial was begun is not sufficient ground for a challenge to the array in the absence of a showing that the defendant was prejudiced thereby, as the statutory provision that no panel of jurors shall be required to render at a term of court more than two weeks' jury service is merely for the protection of the citizen against excessive jury service.

4. SAME—*when indictment is sufficiently indorsed with name of foreman of grand jury.* The middle initial of a man's name and the abbreviations "Sr." and "Jr." are no part of the Christian name, and the fact that Charles R. Carlyle, Sr., was sworn as foreman of the grand jury while Charles Robert Carlyle indorsed the indictment as foreman is not sufficient ground for quashing the indictment.

5. SAME—*when charge of an assault to commit murder is sufficiently proved.* Where a defendant is charged with an assault to commit murder and the evidence shows that the assault was made upon an officer who attempted to arrest the defendant while he was concealing a stolen automobile in an out-of-the-way shed, the facts that it was dark, that the officer, in attempting the arrest,

turned a flash-light on the defendant and ordered him to put up his hands, and that it was not shown that the defendant knew that the party whom he assaulted was an officer, do not disprove the intent charged.

6. SAME—*what evidence is not ground for new trial.* Evidence which is not conclusive or decisive of any issues in the case and which only tends to impeach one of the witnesses as to his ability to identify the defendant is not ground for a new trial.

WRIT OF ERROR to the Circuit Court of Moultrie county; the Hon. GEORGE A. SENTEL, Judge, presiding.

EMERY ANDREWS, (RAYMOND G. REAL, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, and MERRILL F. WEHMHOFF, State's Attorney, (J. L. McLAUGHLIN, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Logan Estes, was convicted in the Moultrie county circuit court on an indictment charging him with assault with the intent to commit murder and he was sentenced to serve an indefinite term in the penitentiary. He prosecutes this writ of error to review the judgment.

The facts proved in the record are substantially the following: Charles Lansden, sheriff of Moultrie county, had received information from certain parties, the full nature of which is not disclosed, that caused him to take with him his deputy, Charles Younger, Charles Getz, chief of police of Sullivan, and about five others, citizens of the county, to a barn or shed on a farm known in the record as the Mary Treat or A. W. Treat farm, for the purpose of making an arrest of some men that were expected to go to that place on the night of August 10, 1921. Inferentially it appears from the record that it was expected that some automobile thieves would attempt to store a stolen Ford touring car in the shed that night, and the purpose of the sheriff

and his posse was to arrest the thieves if they appeared.
The reasons for the evidence not disclosing the actual in-
formation to the sheriff appears to be that the State's at-
torney assumed that it would be error to disclose such
information on the trial of this defendant for assault to
murder. The shed in question is about eighty feet long
and twenty feet wide, the long way of the shed extending
north and south. There is an opening or doorway in this
shed on the east side, perhaps near its center. Just north
of this opening there is a partition extending east and west.
On the north end of the shed, close to the northwest cor-
ner, there are double doors, one opening to the west and
the other to the east and on the inner part of the shed.
This shed is about two miles west of the village of Gays.
It is situated in a field one-quarter of a mile from the west
road running by the farm, one-half mile from the road
running on the east side of the farm, and about half of a
quarter of a mile from the road running on the south side.
There was a field of growing corn to the west and north
of the shed of about forty acres and a stubble field south.
The sheriff and his posse arrived at the shed about 8:30
that evening. It began raining shortly thereafter, and most
of the posse had gone into the south part of the shed
through the east opening to avoid the rain. After they had
been there about an hour the sheriff stepped out of the
building on the east side and Getz shortly afterwards fol-
lowed him. In a few minutes thereafter they heard an
automobile approaching from the south. The sheriff and
Getz walked to the northwest corner and entered the shed
through the double doors, which were open, and got be-
hind the door that opened against the west wall. The au-
tomobile was so close that the other men of the posse in the
south part of the shed did not have time to arrange them-
selves with a view of surrounding the men in the auto-
mobile after they had driven into the shed, and so they
waited until the automobile passed the east door of the

shed, circled northeast and made its turn and headed into the shed, the automobile fronting south. The car had no lights burning, and the night was dark and it was raining. When within a few feet of the northwest opening a flash-light in the hands of one of the men in the car flashed a light into the opening of the shed, the same being turned on and off until the parties in the automobile apparently got their direction and the proper location of the opening. The automobile was then driven in darkness into the shed, the rear of the machine being three or four feet south of the doorway. One of the men followed the machine into the shed on foot, having gotten out while it was stopped to the north of the shed. He followed the machine closely and passed it on the left, walking toward the front. About this time the sheriff moved from behind the door and near the northwest opening of the shed, followed by Getz. As the sheriff got near the northeast wheel of the automobile, and while facing southeast, he flashed his light in the direction he was facing, with his left hand, and as he did so the man walking beside the machine turned around and faced him, and in that flash of light he discovered the defendant, Estes, whom he had never seen or known before, and behind Estes was the other man, a well-known character in that county and whom the sheriff had known well for many years, his name being Odd Niles. Looking into the faces of these men, the sheriff, with an automatic revolver in his right hand, said to Estes and to Niles, "Hands up!" The sheriff repeated this command, and without saying a word Estes drew his gun, and at that moment the sheriff turned off his flash-light and attempted to shoot Estes. His gun failed to go off and he instantly stepped to the right or back of where he was standing, and then Estes fired three shots in the direction where the sheriff was when he turned his light out, and then Niles began shooting. Both Estes and Niles advanced north, firing their guns rapidly until they passed out of the opening behind the automobile, one

of them running northwest and the other straight west into the cornfield. While they were coming out of the shed they shot at Lansden and Getz, who had been standing beside the sheriff all this time, and Lansden and Getz fired at the men as they ran away. The other six men of the posse previous to this time had gone to the north side of the shed, near the north doorway, and as the men ran from the shed these members of the posse began firing at them with shot-guns and revolvers. As the man running northwest got to the edge of the cornfield a number of the posse saw him fall and it was believed by them that he was so wounded that he was unable to arise, but when they hunted for him later they found that both men had gotten away. About twenty shots or more appear to have been fired by the posse and the two fleeing men. Three of the posse positively identified Odd Niles as being one of the men,—Lansden, Getz and C. O. Glasscock, all of whom had known him well for years. These three men had never before known Estes, but they got a good view of him on that night by the flashlight of the sheriff, although it was only for a few moments. They recognized him by his short, stubby mustache and other appearance after he was arrested and on the trial as being the party who was with Niles in the shed.

There was no testimony offered by the defendant, except that he placed on the witness stand Niles, who, it appears, had been in prison for some other offense shortly before and up to the trial. Niles testified that he used to reside in Moultrie county, six or eight miles from Sullivan, and that he resided there ten or twelve years; that he knew Grover Garrett, Zion Buckalew, Billie Kinkade, Owen Glasscock and Lansden, all of whom were of the sheriff's posse on the night of the shooting at the shed; that he did not care to make any statement about the occurrence on that night, for the reason that he understood he was indicted upon the same charge.

The Ford car, after the shooting, was taken from the shed and placed in the garage of V. F. Stanberry, at Gays. It was afterwards identified by C. W. Cox, of Mattoon, the owner of the car, and was turned over to him by Stanberry after the wife of Cox had produced a card issued by the Secretary of State showing that the license had been issued to Cox and after other satisfactory evidence had been revealed. Cox testified positively on the trial that the car was his car and that it was stolen in Mattoon on the night of August 10, 1921. The car was a new Ford car, and he had placed an identifying mark under the engine with a chisel. The evidence proves conclusively that the car in which Estes and Niles drove to that shed that night was stolen and the property of Cox, and that he last saw it about seven o'clock on the evening of August 10. It is also conclusively proved that the defendant made an assault upon Lansden with intent to kill and murder him, which is the substance of the charge in the indictment. Lansden was not described in the indictment as sheriff of the county of Moultrie, and there is no charge that the intent was to kill an officer. The jury would not have been warranted in returning any other verdict, under the evidence in the record, than the verdict returned by them. They fixed the age of the defendant at forty-five years.

All the errors assigned by the plaintiff in error are of a technical character, one of which is that the court erred in overruling his challenge to the regular panel of the jury that was serving at the time the defendant's trial was begun. The challenge was to the array. The record shows in this regard that there were three venires issued and served for petit jurymen at the September term. The first venire contained the names of thirty men, whose names were regularly drawn by the clerk, as provided by the statute, before the term was begun, and they were duly served. After court had been held for a few days only twenty-two jurors were left of this thirty for the regular panel after all entitled

to be excused had been excused by the court. In accordance with section 12 of the Jurors act the court ordered the clerk to draw from the jury box the names of four jurors in the regular way to fill the panel, and they were so drawn and a venire issued November 14, 1921, and the sheriff returned the same served November 18, 1921. There can be no question that this panel was regularly drawn and served and properly filled by the court as aforesaid. On November 21, 1921, by order of the court a third venire was issued for one hundred jurors, drawn in the usual way by the clerk. Thirty-two of them were returned served by the sheriff November 22, 1921. It does not definitely appear from the record for what purpose this venire was issued for one hundred jurors,—whether the venire was ordered for jurors in this case or for jurors in another case tried in that court, known as the Steele case. It is very apparent that the court ordered this venire issued in accordance with the closing proviso of section 8 of the Jurors act, that "whenever there shall be pending for trial in any of said courts any criminal cause wherein the defendant is charged with a felony, and the judge holding said court shall be convinced from the circumstances of the case that a jury cannot be obtained from the regular panel, to try the cause, said judge may at his discretion, prior to the day fixed for the trial of said cause, direct the clerk to draw (in the same manner as the regular panel is drawn) not exceeding one hundred names as a special panel from which a jury may be selected to try said cause." It is therefore clear that the court was acting within his right and within his discretion in ordering the third venire, and that the jurors were regularly drawn and regularly served and for a proper purpose.

In the week of December 5 the court impaneled twenty-four jurors as a regular panel with which to try the defendant. The clerk testified that the previous panel of twenty-four was reduced to about twenty at this time, and that this twenty was composed of jurors served by the first and

second venires.   The clerk also testified that none of these
twenty had served as jurors at all, although the court had
been in session several weeks.   It does not definitely appear
from his testimony whether he means that the jurors had
not served on any case, or whether he means simply that
they had been there the full two weeks but had not been
used as jurors, and we have read the abstract of his tes-
timony carefully.   At any rate, to the twenty jurors the.
court ordered the clerk to add seven that had been sum-
moned by the third venire, calling the names of those jurors
in the order they appeared on the venire,—that is, those
that were served.   From the twenty-seven jurors thus called
into the jury box the court excused three served by the
third venire, and the remaining twenty-four were ordered
to stand as the panel with which to try the defendant.   We
do not think that there was reversible error in the impanel-
ing of the twenty-four jurors, under the holding of this
court in *North* v. *People,* 139 Ill. 81, and *Siebert* v. *People,*
143 id. 571.   Had the court gone strictly according to the
statute in filling this panel, instead of taking seven jurors
whose names appeared in the third venire, the process would
have been to order the clerk to issue a fourth venire to fill
this panel; but he already had had a regular venire of
one hundred names regularly drawn, a part of whom had
been served, and we think the full intention of the statute
was carried out by taking seven men from this list to fill
the panel.   The fact that the whole. hundred jurors were
not served can cut no important figure in the case.   The
important facts are, that the statute requires that an insuf-
ficient panel be filled from jurors regularly drawn by the
clerk and served.   That is exactly what happened in this
case, the only irregularity being, if it was an irregularity,
that the seven jurors of the third panel were not drawn
and served for the particular purpose of filling the regular
panel.   The defendant makes no claim whatever that he
was prejudiced by the court's action in thus filling the reg-

303—39

ular panel. He did not exhaust all of his peremptory challenges in the selection of a jury to try him. It is not the policy of this court to reverse a judgment for a purely technical error unless prejudice is shown to the defendant by such error. The statute, however, regarding the drawing and serving of jurors must be substantially complied with. The fact is that in this case the provisions of the statute have been substantially complied with in that regard in every particular.

Section 8 of the Jurors act provides that "at least twenty days before the first day of any trial term of any of said courts, the clerk of such court shall repair to the office of the county clerk, and in the presence of the county judge and of such county clerk, after the box containing said names has been well shaken by the county clerk and being blindfolded shall without partiality, draw from said box the names of a sufficient number of said persons then residents of said county, not less than thirty for each two weeks that such court will probably be in session for the trial of common law cases, to constitute the petit jurors for that term, and where there is an additional judge in such court, a like number for each additional judge requiring a jury, unless the court shall otherwise order." The requirement of this section that such drawing shall be twenty days before the first day of any trial term is directory, merely, and failure to draw the names within that time is not error. (*Rockford Ins. Co.* v. *Nelson,* 75 Ill. 548.) The intention of the statute is that no panel of jurors shall be required to render at a term of court more than two weeks' jury service, and is a provision for the protection of the citizen against excessive service of that character. The juror may waive this privilege, but the court should give him the benefit of this section and not require him to serve beyond the required time unless he does so voluntarily. Of course, this section must be construed reasonably, and if a juror's service extends beyond two weeks by reason of the length of

time required to try a case begun before the two weeks' service was ended, the juror would of necessity be required to serve until that particular case is completed. If for any reason a panel of jurors has become familiar with the facts of any case standing for trial by reason of the particular character of the case, the panel should not be retained to try that case after its two weeks' service has ended, if the parties litigant in that case object to the panel being used for that trial. It is clear that it is not a peremptory right of a defendant to challenge the array on the particular ground that the panel had served two weeks, in the absence of a showing that he might or would be prejudiced thereby, and it is also clear that a defendant might expressly waive his right to be tried by a new panel, and that he would waive such right in the absence of a positive objection to the array. The safe plan for any court to pursue is to follow the provisions of the statute, or to secure an express waiver by the jurors and by parties litigant before continuing to use a regular panel that had served its full two weeks. Conceding that the panel in question in this case had been in attendance full two weeks at the term of court before defendant's trial was begun, it was not reversible error for the court to overrule his challenge to the array in the absence of a showing that he was prejudiced thereby. There is no such showing in this record nor is there any such claim by the defendant, and the fact that he did not exhaust his peremptory challenges is a sufficient showing that he has no good cause to believe that he was prejudiced. We may further add that a juror who has been in attendance the full two weeks during the trial of cases completes his statutory service of two weeks although he may have been rejected on every case wherein he was tendered as a juror. There is no basis for the claim of the defendant that the jurors were selected to fill the regular panel with a special view of obtaining a jury that would be unfavorable to him in his trial.

The court did not err in overruling the motions of the defendant to quash the indictment and arrest the judgment. The motion to quash was based on two grounds, the first being that Charles R. Carlyle, Sr., was sworn as foreman of the grand jury, while Charles Robert Carlyle indorsed the indictment as foreman of the grand jury. It has been repeatedly held by this court that the middle initial of a man's name is no part of his Christian name. It has also been held that the abbreviations "Sr." and "Jr." are no part of the Christian name. (*Bonardo* v. *People,* 182 Ill. 411.) But the claim is made that the court is not warranted in assuming that Charles R. Carlyle and Charles Robert Carlyle are one and the same person, and that it must be taken, therefore, that the foreman of the grand jury in this case, Charles R. Carlyle, did not indorse this indictment. We may and will take judicial notice of the fact that it is a common practice in this country for a person to bear two given names in addition to his family name, and that his name is usually and commonly written by spelling in full the first given name and using only the middle initial of the second given name, and that sometimes, but rarely, an individual writes both given names in full in signing his name. It is assumed by the defendant that because of the fact that Charles R. Carlyle was further designated or identified by the abbreviation after his name of Sr. there are two Charles R. Carlyles in the same community, and that the other is or may be described as Charles R. Carlyle, Jr. Granting that this is true, we have the same right to assume that the names of both of them are Charles Robert Carlyle, as there would be no special occasion to use the abbreviations Sr. and Jr. unless that were the case, and that a proper writing of either of the names would be Charles R. Carlyle. The middle initial, "R," would therefore stand for the name Robert, whether written by the one or the other of the two Charles Robert Carlyles. As Charles R. Carlyle was selected and sworn as foreman of

the grand jury in this case, we are warranted in assuming that the same Charles R. Carlyle indorsed this indictment by writing his full name, Charles Robert Carlyle. Had the middle initial of the foreman of the grand jury been other than the letter "R" we would not have been warranted in assuming that the foreman of the grand jury and Charles Robert Carlyle, who indorsed the indictment, were one and the same person, as the middle initial of the foreman could not be taken to stand for or to be an abbreviation of the name Robert. It would be an unusual assumption to conclude that because Charles R. Carlyle, Sr., was sworn as foreman, Charles Robert ·Carlyle, Jr., had indorsed this indictment as Charles Robert Carlyle because of the fact that the indictment was indorsed by Charles Robert Carlyle. The presumption is that the foreman selected did his duty and indorsed the indictment in this case.

The other objection to the indictment is that it is bad because it avers no intent to kill Charles Lansden. The charge in the indictment is that the defendant with a certain gun then and there held in his hands and loaded with powder and leaden bullets, unlawfully, willfully and feloniously and with malice aforethought did assault one Charles Lansden, then and there being in the peace of the people, and did then and there discharge the said loaded gun at the said Charles Lansden with the intent in and upon him, the said Charles Lansden, then and there unlawfully, willfully and feloniously and with malice aforethought to commit a murder. The last words in the charge, "to commit a murder," are not the words ordinarily used, but it is clear that the indictment does charge an intent to kill and murder Charles Lansden and not to kill and murder somebody else not named while upon the person of Charles Lansden, as argued by the defendant. The court properly overruled the motion to quash the indictment.

The claim of the defendant that there is no proof in the record that he intended to kill Lansden because there

was no proof that the gun with which he was shooting at Lansden was loaded with leaden bullets, and that he therefore had no ability at that time to kill Lansden, is not tenable. He was accompanied by a desperate and dangerous character, Odd Niles, and they were driving an automobile that had been stolen, and their actions in approaching the shed with the car not lighted were strong circumstances tending to show that they had stolen and were driving away and concealing the automobile that had been stolen less than four hours previous to their driving into the shed. This shooting and the crime of stealing the automobile were so closely connected in their facts as to be one continuous transaction, and it was not possible to separate the facts in the two crimes and get a proper understanding of their conduct and the bearing of such conduct in proving the crime charged. It would have been admissible to have proved that the sheriff had been informed of the fact that the very automobile already mentioned was stolen on that evening and that it was expected that the thieves would drive the car to that shed, and the proof shows, inferentially, that this was the character of the information received by the sheriff before he undertook the arrest. He had a right to collect a posse on such information and to go to the shed and see what happened, and to arrest all persons coming there whose conduct and the possession of such a car showed that they were the parties suspected and to arrest them without a warrant before they could get away. For them to resist Lansden and to kill him to prevent his arresting them would render them guilty of murder, and that is what they plainly attempted to do. The attempted arrest was not unlawful, and their desperate conduct when they were faced by the sheriff and Getz with guns in their hands, to shoot them down and escape, shows clearly that they were resisting arrest for crime, and that they were using loaded guns and not cartridges without bullets. Niles knew the sheriff and the defendant knew

Niles, and the bare fact that the sheriff did not make known to Estes the fact that he was an officer does not demand, under the circumstances, that the jury draw the conclusion or presumption that the defendant thought he was resisting a robber or hold-up man in that out-of-the-way shed. The defendant evidently knew that that was not a place where he could expect to meet robbers or a man that would hold him up for his money or property, but simply a place where he could only expect to see or meet men who were after him because he was supposed to be one of the automobile thieves. All the circumstances show that the defendant carried a loaded gun and that he was shooting a gun loaded with gunpowder and leaden bullets at the officers to prevent his arrest and with intent to kill them. As there was no charge of an assault with the intent to kill an officer, none of the points raised by the defendant have any material bearing on his conduct on that occasion because of the fact that it was not shown that the defendant knew that Lansden was an officer.

The town of Windsor is in Shelby county. Six miles east of Windsor is the village of Gays, in Moultrie county, and about six miles east of Gays is the city of Mattoon, in Coles county. These towns are all on the Big Four railroad, and the railroad runs either through or along the south side of the farm where the shed is located. The People introduced considerable circumstantial evidence tending to show that the defendant was the party that the posse wounded at the shed, and that after the shooting he traveled over that neighborhood trying to telephone to his home in Mattoon for aid. Early in the morning of August 11 a stranger awakened two farmers, Will Sampson and S. A. Walker, who lived near each other on the public road about four miles west of Gays and two miles east of Windsor. This was about 1:30 A. M., and the stranger asked Sampson if he had a telephone, and on being informed that he had a telephone but that it was out of use the stranger went to

Walker's.   He called up Walker and asked him to call up
Mattoon for him on his phone, saying to Walker that his
car had broken down about a quarter of a mile east of there
and that he wanted help.   He gave the number of the phone
that he wanted in Mattoon, but the witness could not re-
member the number but thought it was about 1664.   He
asked the stranger why he did not call the man nearest to
his car, and he replied that he had but his phone would
not work.   Walker tried to call up the number of the phone
in Mattoon wanted but could not get central, and told
the stranger so and that he might get it at the next house.
These places were about two miles from the shed.   On the
same morning, about three o'clock, a stranger came to the
Big Four tower at Windsor and called up to C. E. Hill,
the night telegraph operator of the Big Four, and asked
him to telephone to a number at Mattoon for him, which
number Hill could not remember.   He told the stranger to
come up and use the telephone, but he replied that he had
rheumatism and because thereof he could not climb the
stairs.   He told Hill that his car had broken down half a
mile west of Windsor and that he wanted help, and then
asked Hill where he could find another telephone.   Hill di-
rected him to the hotel, about fifty or sixty feet from the
tower, and saw the stranger go to the hotel and knock at
the door, and noticed from the sound his shoes made when
he walked that the stranger's feet were wet and that he was
lame in his left limb.   Hill had heard of the shooting the
night before and examined the road west of Windsor for
a mile within thirty minutes after the stranger left him but
could not find or see any car on that road.   He heard the
stranger call up Mrs. Bowen, proprietor of the hotel, by
knocking on the door.   He told Mrs. Bowen the same story
about the breakdown of his car and asked her to call for
phone No. 1656 at Mattoon and to ask the folks at that
number to come after him,—to tell them "Nickerson wanted
them to come after him,"—and directed them to come to

the place where the car was broken down. She called for that number and got it and telephoned his message to the folks there. He refused to use the telephone himself, giving as an excuse that he was wet and muddy, and he remained out in the dark while she was phoning. A woman replied to Mrs. Bowen at No. 1656, in Mattoon.

About one o'clock A. M. of August 12 several parties went from Gays in an automobile to hunt for the party that was supposed to have been wounded at the shed the night before. About one mile west of Gays they found the defendant walking east on the Big Four railroad, near the public road, traveling very slowly and using a cornstalk for a cane. He appeared to be very lame in his left leg. On arresting him they found on his person a flash-light and a screw-driver. One of the party recognized him as "Doc" Estes, of Mattoon. Estes told them that he had rheumatism very bad and could hardly get along, and that he was going to Mattoon. They took him in custody and drove back to Gays with him. They noticed that he was wounded and that he blooded the chair considerably that he sat on. On being interrogated he said that he had come a long ways and refused to tell how he had got wounded or shot, saying that that was his business. He told them sometimes men got shot in self-defense and sometimes they got shot in going over the fence. He at first denied that he ever knew or heard of Odd Niles. He later admitted that he had heard about him but was not acquainted with him and never saw him. He admitted finally that he was personally acquainted with Niles. After he was turned over to the sheriff he was examined by Dr. Lawson, who testified on the trial that he found a gunshot wound on the defendant's left hip; that the wounded part was about three inches in diameter and that the skin and muscles were punctured within that area with a number of small-sized shot, about No. 4, and that his clothing was torn and rent about the wound. The doctor stated that it was a very serious wound; that

he made this examination about four o'clock on the morning of August 12; that the wound had been made at least twelve hours or more prior to his examination. Sheriff Lansden testified that while the defendant was a prisoner at the jail three persons from Mattoon visited him frequently at the jail. Two of them were women,—one Miss Flaharty, and the other Mrs. Estes, who the defendant said was his wife. While Mrs. Estes was at the jail she asked that the telephone No. 1656 at Mattoon be called for her for the purpose of talking to a person at that number, that being the same number the stranger had called for at the hotel in Windsor, and she talked to someone at that number.

The foregoing evidence as to the stranger who was trying to telephone to Mattoon is strongly urged by the defendant as incompetent and prejudicial because the stranger was not identified as being the defendant. We think the defendant was sufficiently identified by circumstantial evidence as the stranger who was trying to telephone to his home in Mattoon for help while he was wounded and scarcely able to travel. This appears from the similarity of the stranger's stories to each person whom he asked on the morning of the eleventh of August to telephone to Mattoon for aid for him to the story of the defendant when arrested. The stranger was lame in his left limb, the same as the defendant, and claimed, as did the defendant, that he had rheumatism very bad. The evidence further shows that telephone No. 1656 in Mattoon was listed at the telephone central in Mattoon in the name of Myrtle Flaharty.

There were some minor errors committed by the court in allowing certain parts of the evidence in regard to telephoning to go to the jury, but they are unimportant in the decision of the case. There can be no question about the guilt of the defendant, and another trial would not result in a different verdict as the record discloses in this case. The instructions for the People were stock instructions, and there is no reversible error to be found in the giving of any of them.

The newly discovered evidence offered by the defendant only tends to impeach one of the witnesses as to his ability to identify the defendant as the party with Niles at the shed. Such evidence is not conclusive or decisive of any issue in the case and is not ground for a new trial. *People* v. *Johnson,* 286 Ill. 108.

Defendant's motion for continuance was properly overruled.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*