(No. 19315.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WALTER STEVENS, Plaintiff in Error.

*Opinion filed June 19, 1929.*

R. E. SMITH, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROY C. MARTIN, State's Attorney, and ROY D. JOHNSON, for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Walter Stevens, (hereinafter referred to as the defendant,) was found guilty by a jury in the circuit court of Franklin county on an indictment charging him with the burglary of a chicken house and the larceny of sixteen chickens, of the value of $16, owned by Minerva Johnson. The jury found his age to be thirty-nine years. Motions for new trial and in arrest of judgment were overruled by the court and he was sentenced to serve an indeterminate term in the penitentiary. The record was brought to this court for review by writ of error.

The undisputed facts in the record are the following: On the night of February 20, 1927, Minerva Johnson, who is blind, lived with her husband, J. Marshall Johnson, in West City, which is located on the west side of the west line of the city of Benton, in Franklin county. She owned thirty-seven chickens, which were cared for by her husband and their neighbors, George and Becky Summers. Some of the chickens were marked by having the rear toe cut off of the right foot. On the night aforesaid the chicken house in which these chickens were kept, which was closed and locked, was broken into and twenty-three chickens roosting therein were stolen. The defendant lived at Bakerville, in Jefferson county, about four miles south of Mt. Vernon and about eighteen miles north of Benton, on the State hard road between Benton and Mt. Vernon, in a house owned and also occupied by Mr. and Mrs. John J. Baker. On Friday after the chickens were stolen Johnson went with the sheriff and a deputy sheriff of Franklin county to Bakerville and to Mt. Vernon, where the defend-

ant was under arrest by the sheriff of Jefferson county, and from Mt. Vernon to the home of James P. Williams, about four miles southeast of Mt. Vernon and a short distance east of Bakerville. In the chicken house and chicken yard of Williams, Johnson saw and identified among the chickens there, several that he claimed to be his wife's chickens that had been stolen. After Johnson had returned home Williams and the deputy sheriff of Franklin county delivered to the Johnsons at their home fourteen of the chickens that Johnson had identified as belonging to his wife. Williams also then paid two dollars to the Johnsons for two of the chickens so identified that he had been unable to catch. Williams had previously bought of the defendant the chickens that he delivered to the Johnsons, for which he paid him $17. After Williams had returned the chickens to the Johnsons the defendant's wife re-paid to Williams $17, the amount Williams paid to the defendant for the chickens he sold to Williams.

Nine witnesses testified for the State. J. Marshall Johnson and his wife, Minerva Johnson, and Becky Summers and her husband, G. W. Summers, near neighbors of the Johnsons, living in West City, testified that a number of the chickens stolen from Mrs. Johnson's chicken house were previously marked by cutting off their right rear toes; that Johnson, Mrs. Becky Summers and her husband assisted in the raising and caring for Mrs. Johnson's chickens and were well acquainted with them and knew how they were marked; that Mrs. Summers assisted in marking them by cutting off their rear toes, and she and her husband and Johnson identified a number of the chickens returned to Mrs. Johnson by Williams, and they all testified that the chickens were stolen on the night of February 20, 1927, which was Sunday, and that they were returned to Mrs. Johnson on Friday, February 25, 1927. These three witnesses further testified that the stolen chickens were re-

turned late in the evening in sacks, and that when they were turned loose on the Johnsons' premises they at once went to roost in the same hen-house where they had customarily roosted before they were stolen and thereafter laid eggs in the same nests they had laid before they were stolen. There was one hen among the stolen chickens that did not have her rear toe cut off, but these three witnesses were able to identify her as Mrs. Johnson's chicken by the fact that she was a "speckled hen" of a very different appearance from the ordinary speckled hen. Johnson identified a glove that was introduced in evidence (one of the State's exhibits) as the same glove that was found on the Johnson premises by Neely Gant on February 23, 1927, after the chickens were stolen. Gant, a witness for the State, testified that he found the glove under a barbed wire fence on the Johnson premises, about one hundred yards from the Johnson chicken house, on February 23, 1927, and gave it to Johnson. He was shown the glove that was marked as a State's exhibit and which Johnson testified was the same glove given him by Gant, and Gant testified it looked like the same glove he delivered to Johnson.

John J. Baker and his wife, Lizzie Baker, testified for the State that the defendant was at home on Sunday morning, February 20, 1927, but left with his wife on that day in an automobile, going south toward Benton, and that he returned about eleven o'clock that night; that when he returned he asked Baker where he could put some chickens that he had, and Baker told him that he could put them in his "chicken park," near a store on Baker's premises; that the defendant said on that night that he had tire trouble on the road and had lost a glove. Mrs. Baker testified that she heard the defendant talking to her husband and heard him say that he had lost a glove on the hard road, "just out of Benton." Baker further testified that the glove found by the witness Gant was like the gloves that he had seen the defendant with on the day before that Sunday.

Mrs. Baker further testified that on the next day after that Sunday she saw some chickens at her husband's chicken park, and that on the following Wednesday those chickens were taken away by Williams in sacks, and that the defendant came to her house (also his home) and got the sacks in which the chickens were so carried away.

James P. Williams and his wife, Opal Williams, who live about three-eighths of a mile east of Bakerville, testified for the State, in substance, that on February 20, 1927, he got a load of coal from the defendant and also bought sixteen or eighteen chickens from him, for which he paid him $17, and that those chickens that he bought were just south of an old store building in Bakerville; that a few days after buying the chickens Williams received information from his wife that Johnson had been at his home and identified the chickens as belonging to Mrs. Johnson; that he then caught fourteen of the chickens and delivered them to the Johnsons, in West City, and paid them two dollars for two chickens that he could not catch. Williams further testified that the defendant never told him where he bought the chickens, and that after he had taken them back to the Johnsons the defendant's wife paid him back his money for those chickens, $17. Mrs. Williams also testified that she thought that it was on February 23, 1927, that Johnson was at their house and identified the chickens.

The State's exhibit, the glove found by the State's witness Gant on the premises of the Johnsons, is described in the record as a "high-cuff, black glove."

Clyde Stevens and Roy Stevens, two brothers of the defendant, and Goldie Stevens and Bonnie Stevens, their wives, and Bertha McKinney and Ada McDonald, testified for the defendant that they were at the home of Roy Stevens, in Bluford, in Jefferson county, about eight miles east of Mt. Vernon, on the afternoon and evening of February 20, 1927, at a party and celebration of the birthday of Clyde Stevens. They all testified that the defendant was

at the home of Roy Stevens that evening until about 9:00 or 10:00 o'clock, and they fixed the time of his arrival "at about 2:00 o'clock to 4:30 o'clock," every witness fixing a different time as his arrival and departure.

The defendant testified substantially as follows: He was at the home of his brother, Roy Stevens, in Bluford, on the afternoon and evening of February 20, 1927. He and his wife left Bakerville about two o'clock in the afternoon. They drove north to Mt. Vernon and then east to Bluford. He arrived at his brother's home between four and five o'clock in the afternoon and left about ten o'clock. On his way home he had tire trouble 'and stopped at Mt. Vernon, and there, with the assistance of Charlie Large, repaired a tire and then drove to his home in Bakerville. He did not tell the Bakers that night that he had lost a glove. On February 13, 1927, he and his wife were in West City and on that day his wife traded Mrs. Tom Harrell a coat-suit for sixteen chickens. They took these chickens to Bakerville and arrived there about 6:30 o'clock in the evening. He asked Baker where he could put the chickens, and with Baker's permission he put the chickens in a wire pen on the Baker premises. He told Mrs. Baker he had bought the chickens in Benton. He sold the chickens to Williams about February 23, 1927. He admitted that his wife returned to Williams the amount that Williams paid him for the chickens. He denied having broken into the Johnson chicken house or having stolen the Johnson chickens. He testified that the glove found by Gant was not his glove. "Mine was a plain, black glove. I never saw that glove [the State's exhibit] before. I told Charlie Large where I had been and what I had been for. I said I had been arrested for that, and, of course, he handed me the glove he found in front of his house. That drew his attention to it." He did not tell Joe Talford, deputy sheriff, that he bought the chickens at Waltonville. "Some of the people asked me if my wife would pay the money back

to Williams that he paid me for the chickens, and I said yes."

Charlie Large testified that he helped the defendant repair an automobile tire in Mt. Vernon on the night of February 20, 1927, in front of witness' home. The next morning he found a glove of about the same description as the one found by Gant at the place where he and the defendant had repaired the tire. Neither this witness nor the defendant brought this glove into court or made it an exhibit—the one found by Large and which he claimed he gave to the defendant.

Tom Harrell, a coal miner, and his wife, who lived in West City, and Albert Hill, who testified that he was at their home on February 13, 1927, also testified that on that day the defendant and his wife were at the Harrell home, and that on that afternoon the defendant's wife traded Mrs. Harrell a coat for sixteen chickens, and that the defendant and his wife left with the chickens about sundown of that day.

In rebuttal for the People, Joe Talford, deputy sheriff of Franklin county, testified that when he took the defendant into custody he told witness that he had gotten the chickens he sold to Williams from his sister or sister-in-law, in Waltonville.

It is contended and argued by the defendant that the court erred in overruling his challenge to the array of jurors and in not sustaining his challenges for cause to individual jurors. The abstract of the record does not show a challenge to the array of jurors or any affidavit or evidence in support of such challenge, if made. It does not show the reason for challenge of the individual jurors or that defendant exhausted his peremptory challenges in the selection of the jury which tried the cause. This court has repeatedly held that a party bringing a case to the court must furnish such a complete abstract of the record that it will fully present every error and exception relied on for re-

versal of the judgment of the trial court. (*People* v. *Southern Gem Co.* 332 Ill. 370.) An examination of the transcript of the record discloses that the clerk has inserted, as a part of the record proper, a written challenge to the array of jurors and a written "challenge to poll of jury." Neither of these challenges or motions appears in the bill of exceptions, and no evidence or affidavits in support of the challenge to the array appear either in the record proper or in the bill of exceptions. A challenge to the array, and the evidence in support of it and the ruling of the court thereon, must be preserved in the bill of exceptions in order to have a review of such ruling in a court of review. (*Earll* v. *People,* 73 Ill. 329.) Where a challenge to the array of jurors is made, the challenger must support his challenge by affidavits or proof of the illegality of the panel. (*St. Louis and Southeastern Railway Co.* v. *Wheelis,* 72 Ill. 538; *Borrelli* v. *People,* 164 id. 549.) A case will not be reversed because a challenge to the array of jurors was overruled, unless the record shows that substantial rights of the defendant were thereby impaired. *People* v. *Corder,* 306 Ill. 264.

The record does not disclose that the defendant, in the selection of the jury, exhausted his peremptory challenges, and therefore, even if the abstract were complete, this court would not be justified in reversing the judgment because the court failed to sustain challenges to individual jurors for cause, even if such challenges were well founded. When peremptory challenges are not exhausted it is not reversible error to overrule a challenge to a juror for cause, even if the juror be incompetent. *Gott* v. *People,* 187 Ill. 249; *Collins* v. *People,* 103 id. 21.

It appears that the regular panel of jurors serving at the time the case was called for trial had served two full weeks as jurors, and that they had indicated to the court, on the court's inquiry of them, that they would be willing to serve longer if the court wanted them to do so, and that

the court retained them for this trial. It further appears that the defendant's challenge to the array was based on the fact that the jurors were retained for such service. The intention of our statute in relation to jurors is, that jurors shall not be required to serve beyond the required time of two weeks. But this protection is for the benefit of the citizens against excessive service as jurors. A juror, however, may waive his privilege to be excused at the end of his two weeks' service. It is not a cause for a peremptory challenge to the array or to the individual jurors that the jurors have served two weeks. *People* v. *Estes,* 303 Ill. 602.

It is contended and argued by the defendant that the evidence does not support the verdict of the jury. The material parts of the evidence in this case are above shown. It requires little argument or analysis to show that this case was one that should be settled by the verdict of the jury, as there are no errors in the record sufficient to mislead the jury in their finding. The evidence for the People amply supports the verdict of the jury, and the fact that some parts of it are controverted by the witnesses for the defendant furnishes no reason for the substitution of the judgment of this court for the verdict of the jury, even if the court differed from the jury as to what their finding should be. The chickens sold by the defendant to Williams were well identified by the State's witnesses as being the chickens stolen from the prosecuting witness. The chickens that the defendant claimed to have bought from Harrell were in no way identified or shown to be the chickens that he sold to Williams. The glove the defendant claimed to have lost in front of the residence of Large was not produced in court, and the testimony as to the glove found on the premises of the Johnsons was a strong link in the chain of circumstances tending to show the defendant's guilt. From the finding of the jury the alibi of the defendant was not sufficient, evidently, to raise a reasonable doubt as to the guilt of the defendant. The hour or exact

time that it is claimed the defendant left the home of his brother on the night the chickens were stolen was not definitely fixed by any witness. The hour that he put chickens in the chicken park of Baker was indefinitely fixed by the State's witnesses, the Bakers, as "about eleven o'clock," or two hours or more after the time some of the defendant's witnesses fixed as the time he left his brother's home on the night the chickens were stolen. The distance from his brother's home to the chicken house of the prosecuting witness and from that chicken house to the defendant's home is shown by the evidence to be about fifty miles. It is not necessary to refer to the other incriminating facts.

The judgment should be, and is, affirmed.

*Judgment affirmed.*