# BORAH v. STATE.

## No. A-2261.

### (160 Pac. 27.)

1.  **HOMICIDE—Evidence—Sufficiency.** Where the evidence shows that a husband had virtually abandoned his wife and child, making only occasional visits to them, and had courted and engaged himself to marry another woman, and was arranging to marry her in September, 1913, and that on August 30, 1913, while he was on a visit to his family, the house in which they slept was burned, that he made no sort of effort to rescue the family from the flames, and refused to allow others to enter the house to rescue them, that no screams or cries for help came from the building, though the flames in the wife's bedroom were scarcely noticeable when the first neighbors arrived, and the condition of the wife's body showed she was dead before the body was burned, **held,** that these facts, in connection with other incriminating facts and circumstances, are sufficient to sustain a verdict finding the husband guilty of murder.

2.  **HOMICIDE—Evidence—Admissibility.** Where the husband attempts to explain his unseemly relations with another woman, whom he was engaged to marry, on the ground that he and his wife had for years had a mutual agreement, that when his child reached the age of twelve, he should obtain a divorce, and that in anticipation of obtaining the divorce when the child was twelve, he courted this woman, and expected to marry her in September, **held,** that a letter written by the wife on August 3d, prior to her death on August 30th, which shows that she had no thought of a divorce proceeding, or even suspected that the time had come when she should surrender her place as a wife to another woman, is competent to show her frame of mind, and to rebut the husband's statement as to the anticipated divorce.

3.  **HOMICIDE—Evidence—Weight and Sufficiency.** Where a father made no effort himself to rescue his child from a burning building, made no outcry for help, and even when a friend, at the peril of his own life, said, "By God! I am going in that building," the father replied, "No, you can't go in there," and no cries from the child are heard, **held,** that the jury was warranted in believing that that child's voice had been hushed and its form stilled before it was touched by the flames.

4.  **CRIMINAL LAW—TRIAL—Conduct of Counsel.** Counsel for the state must be fair. The state is as much interested in the vindication and acquittal of the innocent as it is in the conviction of the guilty; and nothing must be relied upon, or resorted to, to obtain a conviction, except the law and the evidence, and the reasonable deductions therefrom. But **held,** that the things com-

plained of in this case, as improper, do not appear in the record, and if they actually occurred, could not have prejudiced the defendant, in view of his own admissions.

5.   **CRIMINAL LAW—Trial—Reception of Evidence—Order of Proof.**
     Where the husband attempted to create the impression that his wife had committed suicide, held, that it was proper to admit in rebuttal of his statements the evidence of a chemist that the stomach and lungs of the wife contained no poison.

*Error from District Court, Atoka County.*
*Robert M. Rainey, Judge.*

W. A. Borah was convicted of murder, and brings error. Affirmed.

*James H. Mathers,* of Ardmore, for plaintiff in error.

*R. McMillin,* Asst. Atty. Gen., for the State.

BRETT, J.   Plaintiff in error in this case, who will be referred to as defendant, was charged and convicted of murdering his wife, and was sentenced to life imprisonment.

The facts are among the most revolting in the annals of crime.

The defendant was born in the state of Kentucky, of worthy parents, and was reared in an atmosphere which should have produced a true and noble character, and we hesitated to believe he could be guilty of the atrocities charged.   But the record forces us to the conclusion that the jury made no mistake.

(1)   In early manhood the defendant courted and won a young woman of his native state, whom the record shows, though mistreated and deserted by him, was true to him to the day of her death.   She was the mother of his child, a little girl, and the testimony is, that this wife not only loved but "idolized him." In 1910 he virtually abandoned her and took up his abode in Sapulpa, and had her to remain at Tishomingo in the little home he had provided for her during the days he loved her.   At first he visited her and his little child about every 60 days, but as time went by his visits grew farther and farther apart, until he got to making only about two visits a year.   And only a few days before

her death her weary submissive soul breathed its agony in a letter to him as follows:

"My dear husband we are disappointed to tears to-day, we looked for you so hard last night, and we did not even get a letter of explanation.

"It is just one month from the 1st of Aug. before Gwendoline starts to school, then if I look wholly to her interest as I have always done, I will be tied another 9 months. Are we to stay here alone, and you home one or twice in a whole twelve months?

"Of course if you will it, we will do it, but do wish some other arrangements could be made.

"Poor 'Peter' how he must have longed for his loved ones when he was exiled. We watch every 'auto' & train, but still we catch no glimpse of you. Perhaps as 'Annie Lee' in 'Enoch Arden' says, we can not adjust our spyglass properly, so we wait a year? Then a month, and still you do not come. · Now won't you sit down this minute and write us a long letter all about your business, and come home as soon as you can leave without too great a loss.

"You never tell me anything about your affairs, but here is the way I have it studied out, I do not see any profit in what you are doing more than you could make here.

"I do not think I am asking too much of you, when I ask you to come home for a while.

"With oceans of love          Ellie Borah."

This letter was written the 3d day of August, 1913, and on the 28th day of August, 1913, the husband came home. But between the time the wife penned this letter and the homecoming of the husband the record shows he received eight most affectionate letters from another woman, whom he had promised to marry in September. In fact the first of these letters, this woman sent him a sample of the goods of which she expected to make her wedding dress. On August 10th, in a letter, she says a friend "asked me my name now, so that she could introduce me to her friends, and was surprised to hear me say, Miss Hewey. Had taken you for my husband. So many people do that, we won't be taken for newly-weds next month."

On August 11th she writes:

"* * * Yes, dear, we are going to be happy—life will begin with another measure of happiness when you make me your bride. Will write you again real soon. Loving you very much I kiss you good-bye.

"Ever yours,                                          Ethel."

On August 15th another letter says:

"* * * A mighty nice letter came from Bartlesville.this morning—I know you have been busy, but I have been well remembered all the time. Do so hope your deal will go thru,—not so much for our trip, but to feel we could do as we wish, but darling, deal or no deal I am expecting you about the middle of September. Know you will try your best to please me—I want you then. * * *"

On August 16th in another letter she says:

"* * * Mama is saving our chickens for the wedding breakfast. Maybe I'll see how much chicken I can make you eat.

"Don't you,think I was real good to you last week; wrote you more letters than you have had in many a week. Felt you were busy and perhaps my letters would bring me nearer to you. * * *

"Dear 'twas only two weeks ago this evening since we went up the river for supper—but it seems months ago since I ate supper with you. Would you like for me to take breakfast with you—just take the car and come up—how I wish you were coming—but dearest, I know you are mighty busy and am going to leave it to you to decide our next visit—maybe I could wait until you come to stay—say you come several days before our wedding—I'd make you work, but you won't object will you—

"Loving you very tenderly and to-morrow I shall be very near you

"Ever yours,                                          Ethel."

On the 18th she again writes:

"* * * My special letter came about ten thirty and brought you very near me—your love seemed to fill the entire day with a certain measure of happiness (never complete with you miles away.) * * *

"Loving you more than I did when I let you go home last Sunday week and trusting every thing will go as we wish, believe me to be

"Ever yours,                                           Ethel."

On August 20th the last of the letter says:

"* * * Mrs. Gibson gives me a party so dearest, you see, you have a very busy girl.

"Yes, I think we could enjoy a car very much. But dear even walks are lovely with you. We seem to enjoy everything when shared with one another. Remember a walk we had one happy Christmas day? * * *

"Will tell you good bye now, with a life that is yours and love enuf for happiness. I kiss the dearest boy in the world good bye

"Lovingly yours,                                        Ethel."

On August 23d a letter closes:

"* * * Dearest, I am hoping you will be home Sunday. Think you can work better for having one days rest—no one expects you to be very busy that day. When you are away on Sunday I am going with you then the day won't seem so long. Darling I am wanting to make your life happy—think I can if I am near you—Loving you oh so much, accept my love and all my kisses for I am,

"All yours,                                             Ethel."

With these letters in his possession the husband goes through the mockery of visiting his wife, the wife of his youth, the mother of his child. About 6 o'clock on the morning of the 30th the neighbors' attention was attracted by human groans. They saw the defendant on the porch in night garments, wringing his hands and groaning: "Oh! Oh!" Before any one reached him he turned and walked back into the house, and closed the door behind him. One after another of his neighbors arrived, but the defendant did not tell any one what the trouble was, or call upon any of them for help. Some of them rushed to the window of the wife's bedchamber, and looking through the glass saw a fire

slowly kindling near the bed. Soon the room was enveloped in flames. About that time a Mr. Wheeler came; and defendant was standing in the yard groaning. Wheeler asked him where his folks were, and the defendant pointed toward the house and said, "I reckon they are in there." Wheeler said, "My God Let's see if anybody is in that house." The defendant replied, "Do not go in there." Wheeler said, "I am going in there;" to which the defendant replied, "No, you can't go in there." No one heard any screams or cries for help proceeding from the building, although the flames were scarcely noticeable when the first neighbors arrived. The voices of the wife and baby were silent. No call for help came from them, and the husband and father, though denying responsibility for their death, did not call for help for them, although he says he saw his child enveloped in flames, and admitted that he did not make any effort himself to rescue his family from the flames. The fire department was called by the neighbors, but the child was burned beyond recognition. The side on which the wife lay was badly burned, but not charred. There were no blisters upon that side, which the physicians testify shows that she was dead before the body was burned. Her mouth was open and her charred tongue was protruding from it. A neighbor asked defendant to go over to her house and put on some clothes. He went, and before dressing stated that his hands were soiled, and asked for a pan of water in which to wash them. He left his night garments on the bed in the room where he dressed, and the arresting officer 30 minutes later examined them and testified they had the smell of coal oil upon them. A five gallon can was found in the room where the wife and child were burned. After the discovery of the letters from the woman he had promised to marry, an officer visited him at the jail and asked him if he knew this woman, and he denied knowing her. Yet, on the witness stand, when confronted by these letters, he admitted his relations with her, that he received the letters from her, that he had given her a $185 diamond ring, and a $65 set of furs, and that he had expected to marry her in September. He also admitted that his affection for his wife had grown cold, that

child, but that his affection for her had waned. There are many other incriminating circumstances, but these are the substantial facts upon which the jury found their verdict. And in our judgment they preclude every other reasonable hypothesis than that of the defendant's guilt. But in addition to this we think the defendant's own testimony condemns him.

(2) His explanation of his unseemly relations with his fiancee is, that in 1910 he and his wife mutually agreed to a separation, and that they also had an agreement that when the child was 12 years old that he should obtain a divorce; that she reached her twelfth birthday on the 14th day of July, 1913, and that relying on this agreement, which was well understood between him and his wife, and in anticipation of obtaining the divorce when the child was 12, he courted this woman, and expected to consummate that engagement by a wedding in September. The wife's lips were sealed, but that letter of August 3d is a more complete refutation of his statement than if she had appeared in person and denied his statement from the witness stand. No one can gather from that letter that she anticipated a divorce proceeding, or that she even suspected that the time had come when she was to surrender her place as a wife to another woman. No thought was further from her mind as she penned those words and closed that touching missive, "with oceans of love."

The defendant complains because the court allowed this letter to be introduced in evidence, and insists that it should have been excluded on the ground that the defendant was not quite sure that he had ever received it. But he identified the handwriting and admitted that it was penned by his wife. And whether he received it or not it was competent to show the frame of her mind, and to rebut his statement as to the anticipated divorce. And it does rebut it as effectually as though it were a voice from the dead.

(3) Again the defendant states that on the morning of the 30th he was waked up suddenly, and heard his child cry, "Oh! papa, we are about to burn up!" that he opened the door and

saw his child wrapped in flames; and he says she "seemed to fall over, and it occurred to me that my wife had committed suicide or done something awful. I was just dazed or, as the lady said a while ago, I lost my presence of mind. It was the awfullest sight I ever saw, and I never had such a feeling in my life. I saw poor little Gwendoly there in the flames." And according to his own statement, at that time the flames did not extend over more than one-third or one-half of the room. She had an open space into which to flee. Yet he made no sort of effort to rescue the child; made no outcry for help; and even when later a friend, at the peril of his own life, said, "By God! I am going into that building," he told him, "No, you can't go in there." The flames had not yet done their work. They had not yet concealed the deeds he intended they should cover. It would be but natural that if this father saw his child wrapped in flames that he should lose his presence of mind, but it would be equally as natural that in his desperation he would go to the rescue, regardless of danger or death. But under the evidence the jury was justified in believing that the child's voice had been hushed and its form stilled before it was enveloped in flames.

Defendant complains of alleged misconduct on the part of counsel for the state. But the matters complained of do not appear in the record, and no objections were made at the time.

(4) Counsel for the state must be fair. The state is as much interested in the vindication and acquittal of the innocent as it is in the conviction of the guilty, and nothing should be relied upon for conviction except the law and the evidence and the reasonable deductions from the same. While the things complained of are not properly presented for our consideration and cannot be considered, yet, even if they were before us they could not work a reversal of this case. One of the most serious complaints is, that the county attorney intimated to the jury that if a certain witness, who was sick, was present he would be able to show improper relations between the defendant and a young lady in Sapulpa. That intimation, if made, was improper; but its only effect could have been to show a motive for the commission

he respected her as a good woman, and as the mother of his of the the crime charged, and surely no stronger motive was needed or could have been shown along that line than the admitted relations of the defendant and his fiancee.

(5)   The defendant complains because the state was allowed to use in rebuttal Professor Williams, of the State University, who testified that he, as a chemist, examined the stomach and lungs of Mrs. Borah, and found no traces of poison in them; the complaint being that this testimony should have been introduced by the state in its case in chief. But we think it was logically and properly offered in rebuttal of the attempted effort of the defendant to make it appear that his wife had committed suicide.

We have examined the record, including the instructions, in this case with the care that its importance deserves, and feel that the defendant was awarded a fair trial, and that the judgment should be affirmed.

The judgment is therefore affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.