BAREFOOT, J.
Defendant, James Easley, was charged in the district court of Tulsa county with the crime of murder; was tried, convicted, sentenced to death, and has appealed.
Defendant was charged with killing his wife, Yivian Easley, in Tulsa county, on June 25,1941, by shooting her.
The petition in error contains 24 assignments of error. Some of them are duplications. Those covered by the brief of defendant will be carefully considered.
In the early case of Anderson v. State, 8 Okla. Cr. 90, 126 P. 840, Ann. Cas. 1914C, 314, this court said:
“In cases where the extreme ’penalty of the law is pronounced against the appellant, this court will thoroughly investigate the record and give to appellant the benefit of any material error, which may have been committed, which operated to his injury, whether the same was excepted to at the trial, or properly presented in the brief of his counsel.”
This rule has been unreservedly followed by this court. Turner v. State, 8 Okla. Cr. 11, 126 P. 452; Bookman v. State, 12 Okla. Cr. 49, 151 P. 1074; Anthony v. State, 12 Okla. Cr. 494, 159 P. 934; also in the federal courts: Strader v. United States, 10 Cir., 72 F.2d 589; Edgmon v. United States, 10 Cir., 87 F.2d 13; Crabb v. United States, 10 Cir., 99 F.2d 325; Hayes v. United States, 112 F. 2d 676; and the late case of Parish v. State, 77 Okla. 436, 142 P.2d 642, decided by this court on October 27, 1943.
*4 This rule will be applied to the record of the instant case.
It is first contended that the information is insufficient and does not charge the crime of murder.
The charging part of the information is as follows:
“* * * did unlawfully, wilfully, maliciously and feloniously, without authority of law, and with a premeditated design upon the part of said defendant to effect death, did effect the death of one Vivian Easley, by shooting and discharging into the body of the said Vivian Easley certain leaden or metal bullets, from a certain revolver or pistol, loaded with gun powder and leaden or metal bullets, which he, the said James Easley, then and there had and held in his hands, then and there and thereby inflicting in and upon the body of the said Vivian Easley certain mortal wounds, from which said mortal wounds the said Vivian Easley did then and there languish and die, contrary to the form of the Statutes in such cases made and provided, and against the peace and dignity of the State.”
It is contended by the defendant that the allegations of the information did not mean that the defendant had a premeditated design to effect the death of Vivian Easley, or any other human being.
The brief of defendant is voluminous, but well prepared, and contains citation of many authorities. The cases principally relied upon by the defendant to sustain his first assignment of error are those by the Territorial Supreme Court. They are: Holt v. Territory, 4 Okla. 76, 43 P. 1083; Jewell v. Territory, 4 Okla. 53, 43 P. 1075; Wright v. Territory, 5 Okla. 78, 47 P. 1069.
He also cites cases decided by this court as follows: Rhea v. Territory, 3 Okla. Cr. 230, 105 P. 314; Byars v. State, 7 Okla. Cr. 650, 126 P. 252; and other cases to which reference will hereafter be made. We shall not review *5 these decisions, for the reason that in our opinion they are not applicable to the facts in the instant case.
In the three Territorial cases cited and relied upon, the indictments were good common-law indictments for murder, bat did not contain the words “premeditated design to effect the death” of the deceased, as provided by the Oklahoma Statutes, 2216 O.S.1931, 21 O.S.A.1941 § 701. For this reason the indictments were held insufficient-
in the instant case, the information, as above quoted, had the term: “with a premeditated design upon the part of said defendant to effect the death, did effect the death of one Vivian Easley,” etc.
The argument that this information is bad because the words “Vivian Easley” do not appear after the word “death,” and that therefore there Avas not a charge to “effect” the death of the deceased, does not appear reasonable, and especially in view of the folloAving sentence, “did effect the death of one Vivian Easley.” This, to our mind, is clearly a technical construction of the words used in the information.
In the case of Turner v. State, supra, Judge Furman, the first presiding judge of this court, gave an exhaustive review, construing the statute on murder, and discussed the very cases decided by the Territorial Supreme Court cited by defendant. He shows in this opinion that the indictments under consideration by that court were draAvn in accordance Avith the terms of the common law, and did not have any application to the terms of the Oklahoma statute. In the information considered in the Turner case, the statement “with a premeditated design to effect the death of him, the said W. H. Archie,” Avas included in the information, and it was held good and the judgment *6 and sentence carrying the death penalty was affirmed. In this same case, reference is made to the cases of Smith v. Territory, 11 Okla. 656, 657, 69 P. 803; Morris v. Territory, 1 Okla. Cr. 617, 99 P. 760, 101 P. 111; Jones v. Territory, 4 Okla. 45, 47, 43 P. 1072; Rhea v. Territory, 3 Okla. Cr. 230, 105 P. 314; and Byars v. State, 7 Okla. Cr. 650, 126 P. 252.
In the Jones case, supra, and the Byars case, supra, it was alleged in the indictment that the murder was committed “with the design to effect death” and the indictment was upheld in each instance.
In the case of Basham v. State, 47 Okla. Cr. 204, 287 P. 761, 762, cited by defendant, the court upheld an information for murder where the words “with a premeditated design to effect death” were omitted altogether, and it was alleged “with the unlawful and felonious intent upon the part of him the said Melvin Basham * * * to kill and murder the said Jim Gladden * * * and [did] mortally wound him * * * from * * * which * * * said Jim Gladden, did die, as was intended by the said Melvin Basham he should do.” Judge Edwards, in rendering the opinion of the court said:
“Defendant contends that an allegation of premeditated design is essential to charge the crime of murder under the first subdivision of section 1733, Comp. Stat. 1921, supra, [21 O.S.1941 § 701] citing numerous authorities, among them: Jewell v. Territory, 4 Okla. 53, 43 P. 1075; Barker v. Territory, 15 Okla. 22, 78 P. 81; Pamplin v. State, 21 Okla. Cr. [136], 140, 205 P. 521. It is necessary to allege a premeditated design in order to charge the crime of murder, yet it is not necessary that the words ‘premeditated design’ be used; the allegation may be made by words of similar import. Fooshee v. State, 3 Okla. Cr. 666, 108 P. 554; State v. Underwood, 17 Okla. Cr. 443, 190 P. 281; Martin v. State, [35 Okla. Cr. 248], 250 P. 552. *7 It is better pleading to follow the approved forms, but, if the language used is equivalent to, or is of the same import as, the phrase ‘with a premeditated design to effect the death,’ as used in the statute, the information sufficiently charges murder.
“We have not traced the history of the term ‘premeditated design’ from its first use in criminal statutes, but an examination of the decisions in the United States discloses that the term formerly was used to describe the state of mind of one who had deliberated or thought over or meditated on a homicide before it was committed; that is, a killing with a ‘premeditated design’ differed from an ‘intentional’ killing, in that the former involved a greater degree of deliberation and forethought than the latter. State v. Brown, 12 Minn. 538 (Gil. 448); State v. Hoyt, 13 Minn. 132 (Gil. 125); People v. Clark, 11 N.Y. Leg.Obs. 4, 13. In Clifford v. State, 58 Wis. 477, 17 N.W. 304, it is said in substance that a premeditated killing implies a lying in wait and settled design. In Craft v. State, 3 Kan. 450, 481, it is said in substance that the word ‘premeditatedly,’ used in defining murder, means planned, contrived, or schemed beforehand. See, also, State v. Yarborough, 39 Kan. 581, 18 P. 474; State v. Dale, 108 Mo. 205, 18 S.W. 976. A premeditated design under our law need not be entertained for any appreciable length of time. It may be a design formed instantly before committing the act by which it is carried into execution. Section 1735, supra. The time requisite to constitute premeditated design may not be distinguishable for the act of the killing, although it may be said to precede the act. 1 Michie, § 14 (2), p. 97; Fouts v. State, 4 G. Greene, Iowa, 500; State v. Harris, 76 Mo. 361; People v. Brunt [46 Hun 675], 11 N.Y.St.Rep. 59. Premeditation is an intent before the act of killing. It means entertainment by the mind of a design to kill, and is often defined as ‘thought of beforehand, any length of time, however short.’ However, the word ‘premeditatedly’ does not mean ‘thought of’ in the sense of ‘thought over.’ 1 Michie, § 13 (1), p. 86, notes.
*8 “In the case of Ernest v. State, 20 Fla. 383, it is held:
“ ‘ “Premeditation” is defined as meaning, intent before the act, but not necessarily existing any extended time before the act. “Premeditated design,” as used in the statutes relating to homicide, means an intent to kill, design means “intent,” and both words imply premeditation.’
“The case, however, was reversed for error in the instructions.
“In Radej v. State, 152 Wis. 503, 140 N. W. 21, 22, it is held:
“ ‘The premeditated design of our statutory murder in the first degree is no more nor less than mental purpose to take human life, formable on the instant preceding the fatal act or some time theretofore, it being sufficient that there be a precedent existence of the purpose and persistency of it to and inclusive of such fatal act.’
“The term ‘premeditated design,’ as it is used in section 1733, supra, is restricted in meaning by section 1735, supra [21 O.S.1941 § 703]. This section may be said to be a definition of premeditated design. Thus the premeditated design does not have that limited meaning particularly applicable to a homicide committed by poisoning or by lying in wait, but to an intentional killing, even where the intent is formed instantly before the committing the act which results in death. This view is further supported by section 1736, Comp.Stat.1921, which provides that homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time. We are led irresistibly to the conclusion that the term ‘premeditated design,’ as the term is used in section 1733, supra, as limited by section 1735, supra, means simply a formed intent to kill, and such intent may be formed instantly preceding the act of killing, and that the allegation of ‘felonious intent to kill and murder,’ coupled with the allegation of death ‘as vas intended,’ is equivalent in meaning and *9 of the same import as an allegation of ‘premeditated design,’ ”
See, also, Holleman v. State, 74 Okla. Cr. 358, 125 P.2d 239; Clark v. State, 63 Okla. Cr. 138, 73 P.2d 481; Burns v. State, 72 Okla. Cr. 409, 117 P.2d 144; People v. Estes, 303 Ill. 602, 136 N.E. 459.
For the reason above stated, we are of the opinion that the court did not err in overruling the motion to quash the information filed in this ease.
The next assignment of error is that the court erred in permitting the witness, Wilma Lee Bailey, the eight year old daughter of Vivian Easley, to testify, on account of incompetency. We have had occasion to pass upon this question in two very recent cases: Daves v. State, 77 Okla. Cr. 343, 141 P.2d 603; and LeFavour v. State, 77 Okla. 383, 142 P.2d 132. The authorities from this state are cited and reviewed in these decisions. It is unnecessary to go into detail. Under our statute, section 272 O.S.1931, 12 O.S.A.1941 § 385, the competency of this witness was a question for the sound discretion of the trial court. We find nothing in the record which causes us to think this discretion was abused. A part of the evidence of this witness corroborated the evidence of the defendant. He received the benefit of it.
The third assignment of error is with reference to the examination of the jurors on their voir dire and to statements made by the county attorney in his opening statement.
We have carefully examined the record, and defendant’s brief which is very exhaustive on each assignment of error. We do not wish to refer to the details, but from such examination we find that there is not sufficient merit in this assignment to justify a reversal of this case. We will refer to the same under another assignment of error.
*10 We next consider assignment of error No. 6, and will hereafter refer to assignments Nos. 4, 5 and 7, as they may be considered together.
This assignment is with reference to requested instructions of defendant, and the instructions given by the court. Thirty-six instructions were given in this case. Defendant requested ten instructions, several of which were included by the court in the general instructions.
We have carefully examined the instructions as a whole. A number were given that could well have been eliminated. If parts of instructions, or lone instructions, are to be considered, we find that there is some merit to the contention of the defendant that it was error to give them, but from a consideration of all of them, it can reasonably be said that they presented to the jury the issues of the case, and the defense offered by the defendant. It would unduly lengthen this opinion to quote them in full.
In defendant’s brief it is contended that “the instructions as a whole are subject to the following objections, which we urge here
“1. The instructions are abstract in nature and do not concretely apply to the facts in the case and do not announce the law governing the facts in the case.
“'2. The instructions are argumentative and confusing, inconsistent and misleading.
“8. The instructions submit to the jury elements of homicide not charged in the information, or raised by the evidence, and therefore, the instructions are much broader than the information.
“4. They assume facts not proven.
“5. They fail to give the jury the law of circumstantial evidence, or of extra-judicial statements or confessions, that is, the court failed to instruct the jury that extra *11 judicial statements or confessions are insufficient to prove the corpus delicti without corroboration, etc.
“6. The instructions of the honorable trial court are not applicable to the defense of the defendant, that is, his own necessary and proper self defense, and the defense of his habitation.”
These objections may be considered together. Under the first and third objections the contention is based upon the court giving to the jury an instruction upon murder as defined by the statutes, and upon the included offenses of manslaughter in the first and second degrees. This contention is based largely upon the fact that the information did not contain the allegation of a premeditated design to effect the death of Vivian Easley, the deceased. This contention has heretofore been discussed with reference to the demurrer to the information. Under the statute, murder is defined under three subheads, section 2216, O.S. 1931, 2.1 O.S.A.1941 § 701. It is contended that the court erred in giving the three subdivisions, and should have instructed only as to the first subdivision. Where the defendant was properly charged with the crime of murder it was proper for the court to define the term murder, as stated in the statute. There was no reason for a limitation to one of the provisions. If either of them had been violated, the defendant was guilty of murder. This was a question of fact for the jury to decide from the evidence. As to the instructions on manslaughter in the first and second degrees, defendant evidently considered at the time they were given that it was to his advantage. It was the duty of the court to instruct the jury upon each degree which the evidence justified, and the court acting upon this duty instructed the jury upon murder, and manslaughter in the first and second degrees.
Instruction No. 5 was a definition of the term “murder” as defined by the statute. The only objection to the *12 giving of this instruction was that it broadened the allegations of the information. This objection has already been considered.
Instruction No. 6 was a long definition of the meaning of “a design to effect death.” In the first place, the record does not reveal that an exception was taken to this instruction. However, we have examined it and do not find any error in the giving of the same.
Instruction No. 7 defined what it took to constitute a “premeditated design.” Defendant withdrew any exception to this instruction, and we do not find error in the giving of the same.
Instructions Nos. 6 and 7, in almost the identical words, have been approved by this court in the case of Brantley v. State, 15 Okla. Cr. 6, 175 P. 51.
The giving of instruction No. 10 is one of the main errors argued by the defendant. This instruction was based upon the murder statute. It dealt with one who commits a homicide by “an act imminently dangerous to others and evincing a depraved mind regardless of human life although without any premeditated design to effect the death of any particular individual. Defendant’s objection is that the court failed to give in connection therewith certain requested instructions upon “threats.” An examination of the record discloses that defendant’s requested instruction No. 10 on “threats” was adopted and given by the court Avord for word, as instruction No. 22.
Instruction No. 11 was upon the third paragraph of the murder statute. There is nothing in this instruction that prejudiced the rights of the defendant. The court limited it so that it would not apply as to defendant having been engaged in the violation of the prohibition lavra.
*13 Instruction No. 14= was with reference to a definition of manslaughter in the first degree. The defendant having been convicted of murder, this instruction has no application. We do not find anything therein which was prejudicial to the rights of the defendant.
Instruction No. 16 is strenuously objected to by defendant. We have carefully read and reread this instruction. It was the contention of the defendant in the trial of this case that at the time of the killing of his wife, the deceased, some unknown party was coming to his home for the purpose of taking away his wife and children. That his wife had proceeded to the front of the premises, and was trying to dissuade this unknown party from entering. That this unknown party fired a shot at defendant, and that when defendant returned the fire, his wife was accidentally killed. Instruction No. 16 was one of several instructions given by the court with reference to this defense. If isolated parts of this instruction are to be considered alone, or if it is not read in connection Avith all the instructions, there are some statements which might be considered prejudicial, but not necessarily reversible error, taking into consideration all of the instructions given.
The court first instructs as to the contention of defendant. He then told the jury that if they found this contention was true, or was sufficient to create in their minds a reasonable doubt, it would be their duty to consider the case under additional instructions concerning manslaughter in the first degree. And if they were “unable” to find the defendant guilty of this crime and “beyond a reasonable doubt,” then it would be necessary for them to consider the case under instructions covering manslaughter in the second degree; and, “if you are unable to find the defendant guilty of that crime, and beyond a *14 reaspnable doubt, it will be necessary for you to find the defendant not guilty of the crime charged in the information, on the ground that the homicide was either justifiable or excusable, concerning all of which you will now be instructed.”
We agree that the use of the word “unable” as indicated in the above instruction was ill-advised. It would have been better to have stated that if after a consideration of the case they did not find the defendant guilty of murder, beyond a reasonable doubt, they should then consider the question of manslaughter in the first degree, etc. However, we do not consider this error was such as to justify a reversal of this case, in view of all the instructions and the record as a whole.
The court, in instruction No. 16, further instructed the jury as follows:
“In other words, since the defendant does not deny that the shot lie fired hit Vivian Easley from the results of which she died, then it will be necessary for you to find the defendant guilty of either murder or manslaughter in the first degree (the manslaughter in the first degree being upon the sole ground that the homicide was- perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner or by means of a dangerous weapon), unless you find from the evidence that another person was there who was attempting to make an invasion of the defendant’s home, and at whom the defendant fired the shot, or you have a reasonable doubt upon that issue.”
This part of the instruction is not very clear, and if standing alone, might be error. The concluding part of the instruction was as follows :
“The state contends that the defendant fired one shot and that was the only shot fired at the time and place al *15 leged in the information. Thé presence of a potential invader would not preclude the possibility of murder or manslaughter in the first degree (upon the one ground above set forth), but if the threatening invader was present, and the defendant fired at him, without intending to injure his wife, and you so find, or if you have a reasonable doubt upon that issue, then the state’s case for murder, or for manslaughter in the first degree, upon the ground above explained, must fail.”
This part of the instruction could well have been omitted, but it was probably more favorable to the defendant than to the state.
Instruction No. 17 is discussed but the record reveals that counsel for defendant advised the court that he did not except to this instruction. This instruction was on an abstract proposition of law, and was unnecessary in this case.
The instructions given submitted the issue of self-defense, accidental killing, and the right of defendant to defend his home and domicile. One of these instructions, No. 20, was as follows:
“The court instructs you that if you believe from the evidence in this case that at the time of the killing of the deceased, Vivian Easley, as charged in the information in this case that the defendant was at his home, a place which the court tells you that the defendant had a right to be, and that he was in immediate danger of death or great bodily harm, then and there about to be inflicted upon him, or which reasonably appeared to the defendant about to be inflicted upon him by a man, who was on the premisés of the defendant, whose name was then and is now unknown to the defendant, or if you have a reasonable doubt thereof, then in that event defendant had a right under the law of our state to use force as reasonably appeared to him to be necessary to protect himself from death or great bodily harm at the hands of the said man, and if *16 you, gentlemen of the jury, believe from the evidence that at a time when the defendant was in immediate danger of death or great bodily harm, then about to be inflicted on him, or which reasonably appeared to defendant about to be inflicted upon him by said man, he, the defendant shot the said man and accidentally and unintentionally shot and billed the deceased, Vivian Easley, or if you have a reasonable doubt thereof, then and in that event you will find the defendant not guilty on the ground of self-defense.
“In this connection, Gentlemen of the Jury, you are further instructed that the rules of law announced and given in the foregoing paragraph of this instruction would apply and do apply, in behalf of the defendant in defending his domicile against every unlawful invasion, and in defending those within it, against violence apparently necessary to prevent a felony without the necessity to retreat, even to the extent of taking life if apparently necessary to prevent a felony from being committed upon and against his domicile.
“And in this connection you are further instructed that if the said man above referred to did, at the defendant’s residence and domicile, in Tulsa County, assault and shoot at the defendant, as stated by the defendant as a witness in this case, said act by the said man would be the commission of a felony upon the defendant’s domicile.”
With reference to threats made by the party whom defendant claimed was invading his home, the court instructed the jury as follows:
“No. 22. You are instructed that evidence has been introduced herein upon the part of the defendant tending to prove that immediately preceding the firing of the fatal shot, the man at whom the defendant claimed he was shooting had made threats of violence against the said defendant James Easley.
“If you find from the evidence that said threats were so made, this evidence should be considered by you in connection with the other evidence in the case to assist *17 you in determining the feelings of the said man who is said to have assaulted tlie defendant toward the defendant and to assist you in determining who was the probable aggressor in the difficulty, in which the deceased, Vivian Easley, lost her life.”
Also instruction No. 23:
“Evidence has been introduced herein upon the part of the defendant tending to prove that prior to his shooting of the deceased, his wife, that some person who was unknown to him except as a voice that he had heard before had made threats of violence against the defendant over the telephone while talking to the defendant’s wife and that the defendant, although not on the telephone, or any extension phone had heard from the same earphone such threats against him by the person who was conversing with the wife of the defendant; and further evidence has been adduced on behalf of the defendant tending to prove that immediately prior to the time the shooting occurred he heard further threats against his life by a man who was coming in the direction of the front of the house of the defendant.
“You are instructed that such threats, should you find the same to have been made, should be considered by you in connection with all the other evidence in the case to assist you in determining whether or not the defendant had reasonable ground for apprehension of danger to himself of such a nature as to justify him in using a gun to attempt to prevent such danger to himself.
“In this connection you are instructed that any attempt at invasion of the home of the defendant could lawfully be prevented by the defendant even to the extent of taking the life of the invader; and if such attempt were being made, and it reasonably appeared necessary to the defendant to shoot to prevent such invasion of his home, the fact that he did shoot under such circumstances would not be an unlawful act.”
These instructions include the defense offered by the defendant, and the requested instruction on threats.
*18 Instruction No. 32 was with reference to what is termed the “Unwritten Law.” This instruction could well have been omitted. The court offered to strike it, but after discussion between counsel, it was left in. It in all probability had no effect on the result in this case.
Instruction No. 34 fully instructed the jury as to each degree and as to the defense offered by defendant. No exception was taken thereto, and it fully stated the duty of the jury if they should find the defendant guilty or not guilty as to the different degrees of murder or manslaughter or of justifiable or excusable homicide.
The contention of defendant that the court erred in failing to give an instruction upon “circumstantial evidence” can not be sustained. No request was made by defendant for such instruction. The evidence revealed that defendant fired the shot which killed the deceased, and he so stated to the sheriff. The state did not, therefore, rely upon circumstantial evidence alone, and while an instruction upon circumstantial evidence might have been given, it was unnecessary. Burns v. State, 22 Okla. Cr. 151, 210 P. 302; Hollingsworth v. State, 50 Okla. Cr. 164, 297 P. 301.
We do not deem it necessary to further consider the instructions given to the jury, except to state that, taking these instructions as a whole, while not expressing the language in the best form, and a number of the instructions given could well have been omitted, they gave the defendant’s defense in this case.
Defendant’s fourth assignment of error is that the evidence is insufficient to sustain the conviction, and especially a conviction imposing the death penalty; and the fifth assignment of error is with reference to the argument of the county attorney and his assistant. These may be considered together.
*19 Defendant was charged with murder by reason of shooting his wife, Vivian Easley, at their home in the city of Tulsa, on June 25, 1941. There were no eyewitnesses to the shooting, except the defendant, unless it may be said that Mrs. A. W. Storz, a neighbor, was an eyewitness. Her evidence will be discussed later.
The first three witnesses for the state were the undertaker and the doctors who examined the deceased. They testified that she died as a result of a gunshot wound. Only one bullet entered the body. The next witness was Wilma Lee Bailey, the eight-year old daughter of the deceased, and step-daughter of the defendant. She testified to being at home the night before the killing. That her mother and step-father were both there. That she got up that morning before anyone else, and dressed the baby boy, Jimmie Easley, and gave him his breakfast. That her mother, the deceased, soon got up and dressed. She was wearing shorts. Her mother asked her what she wanted for breakfast, and she asked for waffles. That her mother left and went to the home of Mrs. Claude Easley, the mother of defendant, to get the waffle iron. This was about eight blocks distance. She returned in a short time and prepared breakfast. The defendant had not gotten up when she returned, and the deceased awakened him. He dressed in his trousers and undershirt. Soon after he got up, her step-father and mother began fussing in the kitchen, and proceeded into the front room, and then into the bedroom. The witness testified, “they fought a little bit in the front room, and then went in the bedroom and fought a little more.” She testified that the defendant went out of the back door but soon returned. When he returned the deceased ran out of the front door. The defendant ran out after her, but before doing so she saw defendant go into the bedroom and he came out with a *20 gun in his hand. Her direct answer as to them going to the front porch was:
“A. Well, my mother went out first, and then Jimmie (the defendant) came back in the house, and then he went out — and then he went in the bedroom and then he came out and went out the front door when she did — I mean after she did.”
The next thing she heard was the gun shooting. She later went out to the front yard, but did not hear the defendant say anything. She testified that the maid was in the house at the time of the shooting. She heard only one shot. She saw her mother’s body lying on the ground and heard the defendant call to the maid, saying, “Hurry and gel some water.” She saw the maid give the water to the defendant, but did not at any time see any other person around there.
On cross-examination this witness gave the same evidence as she had on. direct. She testified that the telephone rang several times that morning and her mother answered it. She thought she was taking orders. She saw her writing down something.
The cross-examination was very thorough, and in ' great detail. The witness did not know as to the passing of time between events, but her testimony was very clear for a child of her age. There were very few contradictions in her testimony, and they were on minor details. Her statement as above outlined was adhered to throughout her direct and cross-examination.
A. Garland Marrs, sheriff of Tulsa county, testified for the state. He testified that defendant came to his office on the morning of the killing. That when he walked into the office defendant was there. That he asked him what had happened, and the defendant said, “Well, we had an *21 argument, and I guess I lost my head and shot her.” Witness asked defendant what he did with the gun, and he told him that he threw it in the shrubbery by the porch. The gun was later recovered by a deputy sheriff at this place.
Elmer Orr, a deputy sheriff, who was present at the time of the conversation between the defendant and sheriff, testified that he went to the home of defendant, in a car with tAvo other deputies and the defendant. That prior to entering the automobile, Mr. Justus, an attorney, was on the sidewalk and he called to the defendant by name, and said, “Jimmie, your father has called Mr. Ward to represent you, and said for you not to talk”; and that the defendant replied, “I don’t know, I might plead guilty.” He testified to the finding of a thirty-eight Smith and Wesson pistol with a scabbard in the shrubbery at defendant’s residence. All of the chambers of the pistol were loaded, except one empty shell.
H. H. Cullison testified for the state. He Avas a county investigator, Avorking out of the office of the county attorney. He qualified as an expert, and testified to examining the body of deceased and probing the body and finding that only one bullet had entered the body, and described the course it folloAved. He also testified to making a careful examination of the premises of defendant immediately after the killing. He found a little blood on one of the steps leading from the front porch down to the sidewalk. He then found a trail of blood around the house on the south side, and on the driveway at the rear he found a trail of blood leading to the back door of the first house south of defendant’s home. There was blood on the handle of this screen door, and “quite a little blood” at the steps, and from the steps there was a trail of blood to the rear of the house “she came out of.” This witness testified to the finding of an automobile in the *22 Easley garage which he identified as belonging to the defendant. lie was asked if there was any whisky therein, but the court sustained an objection to this question. The cross-examination of this witness was very thorough. He did not find any bullet or bullet holes in the banisters. His examination was made just after the killing, but after the body of deceased had been removed from the scene.
Hr. Eillington testified that the bullet wound caused the death of the deceased.
This ivas all of the evidence of the state’ on direct examination.
For the defendant nine witnesses testified. We will first refer to the testimony of the defendant. He testified to having spent the night preceding the killing at his home; to his wife getting up before he did, and going to the home of his mother. While she was away, the phone rang and awakened him. He answered and some strange man asked him if Mrs. Easley (the deceased) was there. Defendant informed him she had probably gone over to his mother’s. In a feAV minutes the phone rang again, and the same voice asked the number of his mother’s phone, and he gave it to him. After doing so, he stated, “This is her husband, who is this?” but the person hung up before answering. Witness Avent back to bed, but was somewhat puzzled about who was telephoning his wife. He did not go to sleep again, and his wife soon returned. A few minutes after she returned, the telephone rang and he overheard a conversation between his wife and one whom he took to be the same party Avho had called before. He heard his wife say, “No, wait a while; he is still asleep. When he gets up and has breakfast, he will go to town, and then you can come over.” He heard his wife say, “I don’t have the children ready.” Defendant got up and went nearer the telephone, and heard the voice say, “Well, I am coming now.” She *23 answered, “No, no, wait. If you wait á while, he will get up and go to town. He will leave.” And the voice said, “I don’t care, I am coming anyway. I have waited long enough.” Defendant then went into the dining room and asked his wife who that was. She said, “You wouldn’t know if I told you.” She refused to tell him who it was, and they began to quarrel. He said they did not fight, but that in about five minutes he heard a car blow its horn in front of the house. His wife ran from the house, through the front door. He followed her, and there was a man got out of his car and was talking to his wife. Defendant heard his wife say, “You are drunk; you don’t know what you are doing, please go back.” The man said “Where are the kids?” His wife said, “They are inside, He wont let me have them.” The stranger then said, “By God, I will go get them.” His wife held on to the stranger’s arm, and told him, “No, no, there will be trouble. Don’t go in there.” and he said, “I am going anyway.” The stranger kept coming, and defendant testified that he ran back to his bedroom and from the closet shelf secured his gun; that he ran back to the front door, and as he went onto the porch, the man fired at him. Defendant did not see his wife at the time, but he fired one shot at the stranger. The stranger dropped his arm as if he had been hit, and changed his gun from his right hand to his left hand, backed off a few feet, and then hurried to his car and left. Defendant then saw his wife holding her neck and crouched over.' She said, “Oh, I am hit.” He testified that he only fired one shot, and when the stranger left that he dropped his gun where he afterwards showed the officers as above stated. That he fired because he thought his life was in danger, and to defend his home. He described the car, but did not know who the stranger was. He went to his wife, and put his arm around her to “steady her.” She *24 said, “I am shot.” Defendant said, “I will take you to a doctor.” She answered, “It wont do any good, I am dying. Forgive me, it Avas my fault. Take care of the kids, see that they are not mistreated.” He then attempted to walk with his wife to the rear of the home, and decided if lie could place her in his automobile, which was in the garage that he could get her to a doctor quicker than one could get out to the home. He then remembered that he did not have the key to the car. By this time his wife became exhausted and collapsed, and h¿ laid her body doAvn on the driveway; Avent in the house and telephoned his mother, and called the maid for water and a cloth, and bathed his wife’s face. That while he was holding his wife his mother came, and soon thereafter his sister and brother-in-law, and two of his brothers. His brother, after examining her pulse, told him his Avife Avas dead. Defendant’s clothing-had become bloody, and he Avent into the house and put on a shirt, and then went onto the front porch, and saAV his mother, sister and brother. ITe saw the bullet hole in the banister, and the bullet mark on the wall. His mother showed them to him and showed him the bullet which she had picked up. The defendant Avas then taken to the county sheriff’s office by his brother-in-law.
The defendant Avas given a thorough cross-examination by the County Attorney, but there was no material deAdation from the testimony he had given on direct examination. Beference may hereafter be made to certain questions propounded by the county attorney.
Mrs. L. O. Todd testified for the defendant, stating that she Avas an artist, and that on July 22, 1941, at the request of the attorney for defendant, she prepared some draAvings of the premises, and these were introduced in evidence. Her husband, L. O. Todd, testified that he was *25 present with his wife on July 22, 1941, when she started the sketch of the premises of defendant, and he examined the premises, and saw the hole in the banister of the porch, and the place on the wall where an impression had been made in the stucco by the bullet.
John Moran testified that he had previously been a state and federal officer for many years. That at request of counsel for defendant, he examined the premises of defendant a short while before the trial, and especially with reference to the bullet marks on the porch. It is unnecessary to review his testimony.
Mrs. Claude Easley, the mother of defendant, testified that she resided about eight blocks from where defendant lived. That on the morning of June 25, 1941, the deceased, Mrs. James Easley, came to her home around 9 o’clock. That her small son, Jimmie Easley, was with her. She stayed there 15 or 20 minutes and while there she received a telephone call from some man. That she only remained a few minutes after the call, and left Avith the waffle iron she had come to get. Witness received information over the telephone about 9:45 or 10 o’clock that Vivian Easley had been shot, and went immediately to the home of defendant. Her' daughter and son-in-law, and two brothers of defendant also went. They went in two separate cars. When the witness arrived, she saw the defendant bending-over the body of deceased. She was lying on the driveway at the back of defendant’s home. After she saw her daughter-in-law was dead, she went to the front porch and found a bullet lying on the porch, and saAV where it had struck the wall of the house. She also saw the hole in the banister. She picked up the bullet, and kept it in her possession until the day of the trial, and produced it at that time. When the defendant came out onto the porch she showed him the bullet and the hole in the banister and *26 the wall. She then gave him her car to go to the sheriff’s office. She left the house then, going to her own home and met the officers coming to the home of defendant.
Priscilla Smith, the sister of defendant, testified to being at the home of her mother at the time she was notified of the death of deceased. That she went in the car with her mother to the defendant’s home. She saw her brother bending over his wife, who was lying on the driveway. She corroborated her mother’s testimony as to seeing the bullet, and the hole in the banister and mark on the wall. She had never seen these marks there before.
Thurman Easley, brother of defendant, testified that he went to the home of defendant about 10 a. m., on the date of the killing. He Avent from the house of his mother in a separate car. He called for an ambulance before he left his mother’s house. He arrived there just a few minutes after his mother did. He saw deceased lying on the driveway and the defendant bending over her, at her head. He testified to going to the front porch and seeing the bullet Avhich his mother found, and also the holes in the banister and the house. He further testified that defendant was excited, and “just broken hearted, and sort of all to pieces like.”
The defendant rested.
On rebuttal the state presented Dora Lee Pettis. She testified she was a maid, working for defendant and deceased. That she was present in the house at the time of, but did not see, the shooting. She heard only one shot fired. She was in the back bedroom. She had heard some fighting between defendant and deceased. She did not know what it was about. She denied taking water and a towel to the defendant.
*27 Mrs. F. D. Summers on behalf of the state and in rebuttal testified that she resided two doors north of the defendant. She was at home on the morning of June 25, 1941, the date of the killing. She heard what she thought was a pistol shot. Only one shot. She did not witness the killing.
Mrs. A. W. Storz for the state on rebuttal testified that she lived the first door to the north of defendant. It Avas about 14 feet to the driveway. She heard a pistol shot on the morning of June 25, 1941. She heard just one shot. She had just stepped out of her house, locked the door and stepped off the porch. She was going to town. She saw the deceased, Vivian Easley, just prior to hearing the shot. “I saw her running out of her drive into the road —in the road and she turned and went north.” Witness testified:
“Well, I started to speak to her; I saw her there, and when she run out she stopped real quick and I started to speak to her, and she was doAvn like this, just wiping her face and she looked up like that, and threw her hair back and she went like this when she saw me. Q. All right, when she saAV you, you mean by that, she turned? A. Uh-huh, real quick.”
This witness then demonstrated before the jury just what the deceased did, and testified that it was just at this time she heard the pistol shot. She heard the defendant say, “Vman,” but could only see him just a little bit, and could not see where the shot was fired from, because of the shrubbery. He went out and grabbed her and said, “Come, this way,” and he started around to the other side of the house. She testified that she never at any time saw any other man present. The only car she saw was a Ford car which she said belonged to the Easleys. She immediately got into the car of Mrs. Summers, and went to the bus line.
*28 On cross-examination this witness testified tbat a few weeks after the killing Mrs. Claude Easley, the mother of the defendant, came to her home and talked to her, and that she told Mrs. Easley that she was not at home on the day of the killing. Her explanation was:
“A. Yes, I told everybody that, because I didn’t want in the deal at all. Q. Yes, and you told Mrs. Easley, the mother of this defendant, that you wasn’t at home, and didn’t know anything about it, didn’t you? A. Yes. Q. Ho you mean to tell the court and jury now that you told Mrs. Easley a lie? A. Well, I guess I do.”
She also testified that at another time she went to Mrs. Claude Easley’s house for the purpose of paying for some furniture she had purchased from her, and that at that time she again told them that she was not at home on the date of the killing, and did not know anything about it.
She testified that she changed her mind when she got the subpoena to be a witness. She also testified that Mrs. Easley, the deceased, was dressed in a yellow house dress. This is contrary to the other state witnesses, who testified that she Avas dressed in shorts. She also testified the defendant had on a blue or grey shirt, Avhen she saw him run toAvards the deceased. This is also contrary to the evidence of witnesses, who testified that he Avas in his undershirt.
It was the contention of the state that no other person Avas present at the time of the shooting, and that no one fired at defendant prior to the time he killed his wife, and that the bullet holes in the banister and in the house were made after the killing occurred. This presented a question of fact for the determination of the jury. The court did not err in refusing to sustain the demurrer to the evidence of the state, or in refusing to sustain the motion of de *29 fendant for a directed verdict of not guilty at the close of the trial.
The record contains the argument of the assistant county attorney, the two attorneys for the defendant, and the closing argument of the county attorney. It is unnecessary to unduly lengthen this opinion by a detailed review of these arguments.
It is the contention of counsel for defendant that the closing argument of the county attorney was such that it caused passion and prejudice of the jury to that extent of causing them to render a verdict of murder against the defendant, and assess the death penalty.
From a complete review of the whole record, we are inclined to agree that this contention with reference to the assessment of the death penalty by the jury is true.
The statement of the county attorney in referring to certain witnesses of the defendant as “lying;” to the fear of a certain witness of being killed by defendant or his father if defendant were released; and the picture drawn before the jury of the execution of the defendant in the penitentiary at McAlester, which was referred to as being made for the purpose of seeing the effect it would have upon the defendant, and pointing him out in person and saying that everyone in the courtroom, including the court, jurors and himself Avere affected by this picture, but that the defendant was not affected, Avhen taken into consideration Avith certain questions propounded to the defendant as to whether or not he was actually the son of Claude Easley, his father, Avhen no proof of any kind or character Avas offered to show that he was not the son of Claude Easley, were such that evidently caused the jury to give the death penalty in this case. The further fact that the defendant was referred to as a man of bad character and *30 reputation, and that he had been engaged in the illegal sale of liquor for a number of years, evidently had great weight with the jury, causing them to sign a verdict carrying with it the death penalty.
There was nothing in the record of this case to show that there had been any ill feeling or enmity of any kind between the defendant and his wife, the deceased, prior to the morning of the killing. They had slept in the same room, and in the same bed, and while it is true that the evidence showed that they quarreled and fussed, and even fought some on the morning of the killing, yet there was nothing in the record to show any motive for the taking of the life of deceased by defendant.
The county attorney in his argument to the jury often called the names of the individual jurors, and his Avhole argument Avas in the nature of placing himself in the jury room with the jury as a thirteenth member of the jury panel, and stating that if he were such juror that he would argue certain facts and testimony with them before not agreeing to a verdict of guilty. This argument might not be reversible error, but Ave can readily see how it Avould influence the jury to give a more severe punishment than they othenvise would.
The closing remarks of the county attorney to the jury Avere:
“* * * j gay t0 you Gentlemen as my parting word with Avhat sincerity of which I am capable, Gentlemen, I say to you unreservedly, it is my honest, sincere, cold, unimpassioned, studied judgment that Jim Easley is guilty in this case, and that he should be sent down to the Penitentiary at McAlester; and, Gentlemen, the quicker he is electrocuted and disposed of, the better off you will be, I will be, and society in general will be.”
*31 This statement when taken into consideration with the whole argument that the death penalty would be the only acceptable verdict of the jury, and that it would be dangerous for a witness of the state if defendant should be discharged, and the whole record causes us to come to the conclusion that the verdict assessing the death penalty was arrived at by reason of passion and prejudice. Haskette v. State, 65 Okla. Cr. 299, 85 P. 2d 761; Ewing v. State, 17 Okla. Cr. 690, 190 P. 274; Rice v. State, 66 Okla. Cr. 434, 92 P. 2d 857; Donaho v. State, 58 Okla. Cr. 198, 51 P. 2d 348; Thurmond v. State, 57 Okla. Cr. 388, 48 P. 2d 845; Borah v. State, 12 Okla. Cr. 540, 160 P. 27.
This court has many times had under consideration the question of modifying the judgment and sentence where the death penalty had been assessed. In the early case of Wilson v. State, 17 Okla. Cr. 47, 183 P. 613, 620, the court said:
“When the death penalty is assessed the trial court is without power or authority to render judgment and sentence except in accordance with the verdict. Owen v. State, 13 Okla. Cr. 195, 163 P. 548.
“It is provided in the Code of Criminal Procedure that ‘the appellate court may reverse, affirm or modify the judgment appealed from.’ Section 6003, Rev. Laws [1910]. [3204, O. S. 1931; 22 O. S. A. 1941 § 1066.]
“By this provision it seems to have been the intention of the Legislature to vest this court with power to modify the judgment, when such a course would be in furtherance of jiistice and conduce to the humane administration of the law. In a capital case it is the duty of this court to examine, with the greatest care, the whole record in favor of life, and. review the case upon the merits to determine whether justice requires a modification of the judgment to imprisonment for life.”
In the case of Bradley v. State, 31 Okla. Cr. 194, 237 P. 625, this court said:
*32 “The death penalty, in the present state of society, in a proper case is no doubt a deterrent to some forms of criminality, and is a protection to society. In those cases where murder is wholly unprovoked, or where there is a lying in wait, or where deliberately committed for the purpose of or in the commission or attempt to commit a robbery, rape, or other felony, the death penalty is warranted; but where a murder is not of the class enumerated, but grows out of a difficulty between the parties, a vindication of the law does not require the infliction of the death penalty. State v. Young, 19 Okla. Cr. 363, 200 P. 260; Walker v. State, 20 Okla. Cr. 316, 202 P. 799.
“We have gone over the record in this case with that care that its importance requires, and, while the evidence sustains the verdict of murder, there are facts and circumstances in the case which should reduce the punishment from death to life imprisonment, and the punishment will accordingly be reduced to life imprisonment at hard labor, and, as modified, the judgment of the court is affirmed.”
Also in the case of Hubka v. State, 40 Okla. Cr. 161, 267 P. 864, 867, we say:
“The duty imposed upon the court of protecting the taking of human life is a grave and solemn one; to take the life of a human being, even when taken by the law, is a trying and grievous task. Considering the whole testimony in this case, we feel constrained to say that we find few palliating circumstances in behalf of the defendant. * * *
“Taking all the facts into consideration and the enmity and feeling that seems to have existed between them, we are of the opinion that the punishment imposed is excessive, and that justice requires a modification of the judgment and sentence of death to that of imprisonment at hard labor in the state penitentiary for life, and, as so modified, the judgment herein is affirmed.”
See, also, State v. Young, and Walker v. State, cited in the Bradley case, supra; and Methvin v. State, 60 Okla. Cr. 1, 60 P. 2d 1062; Holford v. State, 57 Okla. Cr. 431, *33 48 P. 2d 1082; and Goben v. State, 32 Okla. Cr. 237, 240 P. 1085.
Eliminating the defense offered in this case, the facts are not such that justify the inflicting of the death penalty, as shown by the authorities above cited. There being no evidence of ill will between the defendant and deceased prior to the morning that they had a fuss just prior to the hilling, and no motive being shown as to Avhy the defendant should desire to kill his own Avife, and the errors heretofore discussed as revealed by the record in this case, we cannot but come to the conclusion that justice demands a modification of this judgment from that of death, to a term of life imprisonment at hard labor.
For the reasons herein stated, the judgment and sen-, fence of the district court of Tulsa county is modified from that of death, to a term of life imprisonment, at hard labor, in the State Penitentiary, and, so modified, the judgment is affirmed.
JONES, P. J., and DOYLE, J., concur.